William H. SEIPPEL and Sharon A. Seippel, Plaintiffs,

v.

SIDLEY, AUSTIN, BROWN & WOOD, LLP; R.J. Ruble; Deutsche Bank, A.G.; and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex Brown, Defendants.

No. 03 Civ. 6942(SAS).

United States District Court, S.D. New York.

June 16, 2005.

---

Blair C. Fensterstock, Esq., Maureen McGuirl, Esq., Fensterstock & Partners, L.L.P., New York City, for Plaintiffs.

Laurence M. Hill, Esq., Seth C. Farber, Esq., Dewey Ballantine, L.L.P., New York City, for Defendants Deutsche Bank AG and Deutsche Bank Securities.

Aaron R. Marcu, Esq., Andrew A. Ruffino, Esq., Jason P. Criss, Covington & Burling, New York City, Brad D. Brian, Esq., Bruce D. Abbot, Esq., Richard E. Drooyan, Esq., Munger, Tolles & Olson, L.L.P., Los Angeles, CA, for Defendant Sidley Austin Brown & Wood.

Stuart Abrams, Esq., Frankel & Abrams, New York City, for Defendant R.J. Ruble.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

This case arises out of tax and consulting services offered by several professional law, financial services and accounting firms. Plaintiffs, William and Sharon Seippel, allege that defendants[1] defrauded plaintiffs through the development, marketing and sale of a tax shelter (a strategy involving digital options or swaps on foreign currency sometimes known as "COBRA") which they knew the IRS would challenge as lacking economic substance. The Seippels filed this suit on September 10, 2003, alleging that defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and are liable for damages and other relief arising from breach of fiduciary duty, inducing breach of fiduciary duty, fraud, negligent misrepresentation, breach of contract, malpractice, "unethical, excessive, illegal and unreasonable fees," and unjust enrichment.[2] The Seippels allege

---

1. Defendants fall into two groups. The Sidley Defendants are Sidley Austin Brown & Wood, LLP, and R.J. Ruble. Sidley Austin Brown & Wood, LLP is the successor to Brown & Wood, LLP. R.J. Ruble is a former partner of Sidley Austin Brown & Wood. The Deutsche Bank Defendants are Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex Brown. Initially, the Seippels also brought claims against Jenkens & Gilchrist, P.C. and its former Managing Shareholder Paul M. Daugerdas ("Jenkens"). At the time of the Court's August 25 Order, the Seippels' claims against Jenkens were stayed during the pendency of class settlement negotiations. *See Denney v. Jenkens & Gilchrist*, No. 03 Civ. 5460, 2004 WL 1197251 (S.D.N.Y. May 19, 2004). Subsequently (and prior to the filing of their Second Amended Complaint) the Seippels voluntarily dismissed their claims against Jenkens.

2. Amended Complaint ("Compl.") ¶ 2.

both federal question jurisdiction pursuant to 28 U.S.C. § 1331 and diversity jurisdiction pursuant to 28 U.S.C. § 1332.

In an Opinion and Order dated August 25, 2004, the Court granted, in part, the Deutsche Bank and Brown and Wood Defendants' motions to dismiss.[3] The Seippels' factual allegations are described in detail in that Opinion, familiarity with which is presumed. The Court held that the Seippels' RICO claims were barred by Section 107 of the Private Securities Litigation Reform Act ("PSLRA") of 1995.[4] The PSLRA amended RICO to provide that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."[5] Because—as argued by the Deutsche Bank and Brown & Wood defendants—the conduct alleged by the Seippels is "in connection with" the purchase or sale of securities, and is therefore actionable as securities fraud, the Court dismissed the Seippels' RICO claims. However, the Court sustained the Seippels' common law fraud claim, finding that the Seippels had alleged that claim with the particularity required by Federal Rule of Civil Procedure 9(b). The Court also dismissed the Seippels' state law claims for breach of fiduciary duty, malpractice, negligent misrepresentation, breach of contract and inducing breach of fiduciary claims, but sustained the Seippels' state law disgorgement claim. Finally, the Court granted the Seippels leave to amend their complaint to state a claim for securities fraud. The Seippels have filed a Second Amended Complaint, alleging a securities fraud claim.

The Deutsche Bank Defendants and Brown & Wood Defendants now move to dismiss the Seippels' securities fraud claim. Defendants argue, *first*, that the Complaint does not satisfy the heightened pleading standards of the PSLRA; *second*, that the Seippels' securities fraud claim is time-barred; and *third*, that the Seippels' securities fraud claim against Deutsche Bank and Brown & Wood is an improper claim of aiding and abetting. Deutsche Bank also argues that Sharon Seippel has no standing to assert a claim of securities fraud. Finally, Deutsche Bank now moves to dismiss the Seippels' common law fraud claim as time barred.[6]

## II. THE STANDARD OF REVIEW

A motion to dismiss should be granted only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.' "[7] At the motion to dismiss stage, the issue "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test."[8] The task of the court in ruling on a motion to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of evidence which might

3. *See Seippel v. Jenkens & Gilchrist*, 341 F.Supp.2d 363 (S.D.N.Y.2004), *as amended by* 2004 WL 2403911 (Oct. 26, 2004) ("August 25 Order").

4. Pub.L. No. 104–67, § 107.

5. 18 U.S.C. § 1964(c).

6. In its previous challenge to this claim, Deutsche Bank argued that the Seippels had failed to allege reliance on any misrepresentations attributable to Deutsche Bank.

7. *Weixel v. Board of Educ. of New York*, 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (alterations omitted)).

8. *Phelps v. Kapnolas*, 308 F.3d 180, 184–85 (2d Cir.2002) (quotation omitted).

be offered in support thereof." [9] When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor.

■ A complaint need not state the legal theory, facts, or elements underlying the claim except in certain instances.[10] Pursuant to the simplified pleading standard of Rule 8(a) of the Federal Rules of Civil Procedure, "a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[11] In contrast, the heightened pleading standard of Rule 9(b) requires that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity."[12] A complaint alleging fraud must: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"[13] "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."[14]

■ Rule 9(b) is intended "to provide a defendant with fair notice of plaintiff's claim, to safeguard a defendant's reputa-tion from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."[15] Accordingly, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent.[16] Allegations of fraud may not be based upon information and belief, except as to matters peculiarly within the opposing party's knowledge; in such a case, the allegations must be accompanied by a statement of the facts upon which the belief is founded.[17]

■ "Similarly, the PSLRA [ ] requires that any securities fraud complaint alleging misleading statements or omission of material fact must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[18] The PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs."[19] "Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act [the Second Circuit does] not

9. *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir.2004) (quotation omitted).

10. *See Phillips v. Girdich*, 408 F.3d 124, 126–28 (2d Cir.2005).

11. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Rule 8(a)(2)).

12. Fed.R.Civ.P. 9(b).

13. *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

14. *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987).

15. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

16. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995).

17. *See DiVittorio*, 822 F.2d at 1247.

18. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004) (quoting 15 U.S.C. § 78u–4(b)(1)).

19. *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir.2000).

require the pleading of detailed evidentiary matter in securities litigation."[20]

## III. DISCUSSION

### A. The Seippels Have Pled Their Securities Fraud Claim With Sufficient Particularity

■ The Court has already determined that the Seippels have alleged their common-law fraud claims with sufficient particularity to meet the heightened pleading standards of Rule 9(b). Similarly, the Seippels' allegations of securities fraud are pled with sufficient particularity to meet the requirements of the PSLRA. The Complaint identifies the allegedly false statements made to the Seippels, explains why they were false, and states when, where and by whom they were made.

The representations on which the Seippels' claims rely were made by Charles Paul of Ernst & Young, not directly by Deutsche Bank or Brown & Wood. However, the Seippels allege, on information and belief, that Paul was "acting at the behest of and with the knowledge and authority of" Deutsche Bank and Brown & Wood.[21] The Seippels' Complaint sufficiently supports that belief. The Complaint describes the role played in the conspiracy by each defendant, including Brown & Wood and Deutsche Bank.[22] The facts pled regarding the relationship between defendants and Ernst & Young, and the role played by defendants in devising and mar-

keting COBRA, in addition to the facts regarding the communications made directly by Brown & Wood and Deutsche Bank to the Seippels, adequately justify the Seippels' belief that Deutsche Bank and Brown & Wood were responsible for the alleged misrepresentations made by Paul. The allegations in the Complaint thus sufficiently ensure that each defendant receives notice of the nature of its participation in the alleged fraud.[23]

### B. The Seippels' Securities Fraud Claim Is Not Time–Barred

The Seippels filed their Complaint in September, 2003. The alleged securities fraud took place in 1999, when defendants approached the Seippels and the Seippels engaged in the COBRA transaction. The Seippels allege that they first learned of the fraud "after July 2002," when they hired new tax and legal advisors.[24] Prior to the enactment of the Public Company Accounting Reform and Investor Protection Act of 2002 ("Sarbanes–Oxley"),[25] the applicable statute of limitations for securities fraud claims was the earlier of three years from the violation or one year from its discovery.[26] Sarbanes–Oxley lengthened the statute of limitations for securities fraud claims to the earlier of five years from the violation or two years from the discovery.[27] This extension applies to all proceedings commenced on or after the date of enactment, July 30, 2002, even

---

**20.** *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir.2001).

**21.** Compl. ¶¶ 36–38.

**22.** *See e.g., id.* ¶¶ 10–16, 18–23. *See also* Declaration of Robert B. Coplan, National Director of Ernst & Young's Center for Family Wealth Planning, Ex. A to Declaration of Robert L. Lash, counsel for the Seippels, in Opposition to Defendants' Motions to Dismiss (describing the agreed-upon roles of Ernst & Young, Jenkens, and Deutsche Bank, but describing Brown & Wood as "independent").

**23.** *See DiVittorio*, 822 F.2d at 1247. *See also Faulkner v. Beer*, No. 03 Civ. 5284, 2005 WL 476976, at *8 (S.D.N.Y. Feb. 28, 2005).

**24.** Compl. ¶ 75.

**25.** Pub.L. No. 107–204, § 804 (2002).

**26.** *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

**27.** *See* 28 U.S.C. § 1658(b).

where the claim accrued prior to that date.[28] However, Sarbanes–Oxley does not operate retroactively to "revive [previously] expired securities fraud claims."[29]

Defendants argue that the Seippels cannot avail themselves of Sarbanes–Oxley's extension of the statute of limitations, because their claims had already expired prior to Sarbanes–Oxley's enactment on July 30, 2002. Relying on two published IRS notices, IRS Notice 1999–59 and IRS Notice 2000–44, and a 1998 decision of the Third Circuit, *ACM Partnership v. Commissioner*,[30] defendants argue that the Seippels were on inquiry notice of the alleged fraud at the latest in September 2000, when IRS Notice 2000–44 was published. Defendants argue that the Seippels' securities fraud claims therefore expired one year later, in September 2001, prior to the enactment of Sarbanes–Oxley.

*ACM Partnership* scrutinized a 'contingent installment sale' shelter purchased by Colgate–Palmolive from Merrill Lynch. The court held that the losses generated by the transaction were not allowable as federal income tax deductions, because the transaction was devoid of economic substance.[31] IRS Notice 1999–59, published on December 27, 1999, was titled "Tax Avoidance Using Distributions of Encumbered Property." The Notice described "certain types of transactions [similar to COBRA] that are being marketed to taxpayers for the purpose of generating tax losses" and stated that "the purported losses arising from such transactions are not properly allowable for federal income tax purposes."

Finally, IRS Notice 2000–44, according to the Seippels' Complaint, described (although not by name) the "precise" transaction marketed under the name of COBRA.[32] The Notice described a transaction in which

> a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1000X and simultaneously write offsetting call options ... Those option positions are then transferred to a partnership.... Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced [ ] as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore [ ] the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options [ ] even though the taxpayer's net economic outlay to acquire the partnership interest are [sic] nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss [·] even though the taxpayer has incurred no corresponding economic loss.

Citing *ACM Partnership* and IRS Notice 1999–59, the Notice stated that "[t]he purported losses resulting from the transaction[ ] described above do not represent bona fide losses reflecting actual economic consequences."

 " 'A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the stat-

28. *See Ato Ram, II, Ltd. v. SMC Multimedia Corp.* No. 03 Civ. 5569, 2004 WL 744792, at *5 (S.D.N.Y. April 7, 2004).

29. *In re Enterprise Mortgage Acceptance Co. Sec. Litig.*, 391 F.3d 401, 403 (2d Cir.2004).

30. 157 F.3d 231 (3d Cir.1998).

31. *See id.*

32. Compl. ¶ 66.

ute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.' "[33] "Discovery of facts for the purposes of this statute of limitations 'includes constructive or inquiry notice, as well as actual notice.' "[34] To be placed on inquiry notice, plaintiffs "need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them."[35] A plaintiff in a securities fraud case " 'is charged with knowledge of publicly available news articles and analysts' reports' to the extent that they constitute storm warnings sufficient to trigger inquiry notice."[36] Available information must establish a "probability, not a possibility" of fraud to trigger inquiry notice.[37] "Southern District courts have variously described defendants' burden in this regard as 'extraordinary' and 'appropriate only in extreme circumstances.' "[38]

▮▮▮▮ *ACM Partnership* and IRS Notice 1999–59 cannot have placed the Seippels on inquiry notice. Where "warning signs are accompanied by reliable words of comfort from management, [s]uch statements are among the factors that must be considered when evaluating whether the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded."[39] Here, before entering into the COBRA transaction, the Seippels were expressly informed by the Brown and Wood Defendants and by Jenkens that *ACM Partnership* and Notice 1999–59 did not apply to COBRA.[40] Such "reassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern."[41] The Seippels were clearly entitled to rely on defendants' advice regarding technical issues of tax law.

> When an accountant or attorney advises a taxpayer on a matter of tax law [ ] it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.[42]

33. *In re Initial Public Offering Sec. Litig. ("In re IPO")*, No. 21 MC 92, 2004 WL 3015304, at *2 (S.D.N.Y. Dec. 27, 2004) (quoting *Dodds v. Cigna Sec. Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)).

34. *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000) (quoting *Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993)).

35. *Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997).

36. *In re IPO*, 2004 WL 3015304, at *2 (quoting *Westinghouse Elec. Corp. v. '21' Intern. Holdings, Inc.*, 821 F.Supp. 212, 222 (S.D.N.Y.1993)).

37. *Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir.2003).

38. *In re Sumitomo Copper Litig.*, 120 F.Supp.2d 328, 347 (S.D.N.Y.2000) (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F.Supp. 68, 76 (S.D.N.Y.1996)).

39. *LC Capital Partners, L.P. v. Frontier Ins. Group*, 318 F.3d 148, 154 (2d Cir.2003).

40. *See* Brown & Wood Opinion Letter, Ex. C to Declaration of Aaron R. Marcu, counsel to Sidley Defendants, in Support of Brown & Wood's Motion to Dismiss the First Amended Complaint; Jenkens Opinion Letter, Ex. C to Declaration of Ann E. Schofield, counsel to Jenkens, in Support of Jenkens's Motion to Dismiss the First Amended Complaint.

41. *LC Capital Partners, L.P.*, 318 F.3d at 154.

42. *United States v. Boyle*, 469 U.S. 241, 251, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985).

IRS Notice 2000–44, although issued after the Seippels engaged in the COBRA transaction, was also not sufficient to place the Seippels on inquiry notice. The Notice does not mention either COBRA or any of the defendants or their alleged co-conspirators by name. The Notice's description of a COBRA-like scheme is admirably clear, given the complexity of the subject matter. It is not so clear, however, that an ordinary taxpayer could be expected to understand the "probability, not the possibility" the transaction described in the Notice was COBRA.[43] To have understood the import of Notice 2000–44 would have required more legal expertise than can be demanded of ordinary taxpayers—even wealthy, but otherwise typical taxpayers such as the Seippels.

Defendants do not point to any press reports, complaints or other public documents referring to Notice 2000–44 or explicitly calling COBRA's lawfulness into question, or to anything that might have caused ordinary taxpayers to suspect that it was not safe to rely on the advice of their tax lawyers. Instead, defendants place great weight on the Seippels' allegation that Notice 2000–44 "specified the precise transaction marketed by the Defendants to Plaintiffs as the COBRA transaction."[44] Defendants' reliance on this phrase is misplaced. Defendants' argument asks the Court to construe the Complaint strictly *against* plaintiffs, rather than in their favor as the law requires. In context, the Complaint's meaning is clear: it alleges that IRS Notice 2000–44 made the unlawfulness of COBRA clear to the tax and investment professionals named as defendants, rather than to plaintiffs.

### C. Defendants Are Liable As Primary Violators

In *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, the Supreme Court held that there is no private cause of action under the federal securities laws against aiders and abettors of section 10(b) violations.[45] "The statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act."[46] Defendants argue that the Seippels' allegations amount at most to a claim that defendants merely aided and abetted Ernst & Young in inducing Plaintiffs to enter into the COBRA transaction.[47]

---

43. The Seippels also argue that the Notice was not sufficient to put them on inquiry notice because it did not refer to certain details of the alleged fraud—specifically, that Brown & Wood and Jenkens "concealed their role as promoters of COBRA and the adverse effect that role would have on the ability of the Seippels to rely on their opinion letters." The Seippels' Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Seippel Mem.") at 6. This argument is unavailing: "the question is not whether the materials suggested the full extent of defendant's deceit; the question is whether the materials suggested that there were any material misrepresentations. To the extent that there was such a suggestion, plaintiffs were left with a duty to inquire." *Addeo v. Braver*, 956 F.Supp. 443, 450 (S.D.N.Y.1997). If Notice 2000–44 had been sufficient to put the Seippels on notice that defendants had misrepre-

sented the lawfulness of COBRA, then the Seippels would have been under a duty to make further inquiry.

44. Compl. ¶ 66.

45. 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). The Court noted, however, that "[i]n any complex securities fraud [ ] there are likely to be multiple [primary] violators." *Id.* at 191, 114 S.Ct. 1439.

46. *Id.* at 177–78, 114 S.Ct. 1439.

47. The Seippels argue that if the Court were to dismiss their securities fraud claim on the ground that it is merely a claim of aiding and abetting, their RICO claims should be reinstated. Although I do not reach this argument, I note that courts in this district are split on this issue. *Compare OSRecovery, Inc.*

██ The Second Circuit interpreted *Central Bank* in *Wright v. Ernst & Young LLP*.[48] *Wright* noted that, following *Central Bank*, "federal courts have differed over the threshold required for a secondary actor's conduct to implicate primary liability."[49] Other circuits had held that secondary actors could be primarily liable for "statements made by others in which the [secondary actor] had significant participation."[50] *Wright* rejected this "substantial participation" test, in favor of a "bright line" rule that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)."[51] The defendant "must 'know or should know' that [its] representation would be communicated to investors."[52] Moreover, the statements must be attributable to that defendant: "a secondary actor cannot incur primary liability under the Act for a statement not attributed to that actor at the time of its dissemination [—] that is, in advance of the investment decision." "Anything short of such conduct is merely aiding and abet-ting, [ ] no matter how substantial that aid may be."[53]

*Wright* emphasized, however, that *Central Bank* "did not hold that secondary actors are always free from liability under the Act. Rather, secondary actors like accountants may be held liable as primary violators if all the requirements for primary liability are met, including 'a material misstatement (or omission) on which a purchaser or seller of securities relies.'"[54] *Wright* also held "[t]here is no requirement that the alleged violator *directly* communicate misrepresentations to [investors] for primary liability to attach."[55]

██ The Seippels' allegations are very different from those at issue in *Central Bank* and *Wright*. "[T]he *Central Bank* and *Wright* plaintiffs only alleged that the defendants knew of the purported fraud through transactions with the defrauders, but failed to expose the deception."[56] In contrast, the Seippels do not allege that defendants merely assisted in a fraud conceived and perpetrated by Ernst & Young. Rather, the Seippels allege that defen-

*v. One Groupe Intern., Inc.*, 354 F.Supp.2d 357 (S.D.N.Y.2005) (finding that the PSLRA does not bar a RICO claim where the conduct alleged constitutes aiding and abetting a securities fraud, because such conduct is not actionable as securities fraud) *with Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 0793, 2005 WL 500377, at *4 (S.D.N.Y. Mar. 2, 2005) (denying leave to amend complaint to add RICO claim, because the PSLRA "does not say 'no person may rely on a defendant's conduct actionable as securities fraud to establish a RICO violation against that defendant.' Rather, it is written broadly to bar reliance on any conduct, no matter whose conduct it is. Thus, even were the Court to conclude that any defendant's conduct merely constituted unactionable aiding and abetting of Baron's securities fraud, the First Amended Complaint still relies extensively on Baron's and its brokers' securities fraud to establish such a defendant's liability under RICO.").

48. 152 F.3d 169 (2d Cir.1998).

49. *Id.* at 174.

50. *Id.* at 175 (citing *In re Software Toolworks*, 50 F.3d 615, 628 n. 3 (9th Cir.1994) (holding that an accountant may be primarily liable based on its "significant role in drafting and editing" a letter sent by the issuer to the SEC)).

51. *Id.*

52. *Id.*

53. *Id.*

54. *Id.* at 174 (quoting *Central Bank*, 511 U.S. at 191).

55. *Id.* (emphasis added) (alteration in original).

56. *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir.2001).

dants engineered and were key members of the conspiracy to defraud. The Seippels do not allege that defendants merely assisted in the preparation of Ernst & Young's misrepresentations; the Seippels allege that those misrepresentations were caused by defendants and made on their behalf.[57] The Seippels allege that defendants conceived COBRA and the conspiracy to promote COBRA; and that they agreed among themselves that, rather than approaching taxpayers directly, they would use Ernst & Young to sell COBRA to taxpayers.[58] In essence, the Seippels allege that defendants made misrepresentations to them, albeit indirectly, using Paul as their agent and mouthpiece.

If true, these allegations are sufficient to hold defendants liable as primary violators. *Wright* does not require that a defendant *directly* communicate the alleged misrepresentation to the plaintiff. In *Suez Equity Investors*, the Second Circuit rejected defendants' argument that they were not liable as primary violators because the misrepresentations at issue in that case were transmitted by an agent, DeRoziere. The court held that "[t]he fact that DeRoziere, or any other agent of the corporate defendants, may have supplied the [misrepresentations] does not preclude them from primary liability. A corporation can only act through its employees and agents ... and an allegation that a particular agent may have doctored or conveyed the report will not immunize the principals from liability for a knowing deception." [59] The fact that defendants—if the Seippels' allegations are true—transmitted their representations to the Seippels through an agent, rather than making them directly, does not allow them to escape responsibility for such statements.[60] To allow defendants to escape the reach of the securities laws because they used Ernst & Young's personnel to approach the Seippels, rather than their own, is not required by *Central Bank* or by *Wright*, and " 'would place a premium on concealment and subterfuge

---

**57.** I note that the Seippels dealt directly with defendants and paid them fees, whereas the outside professionals who are typically found to be mere aiders and abettors interact only with the primary wrongdoer. *See* Compl. ¶¶ 51, 58. Defendants here thus had a far stronger motive to promote the alleged fraud, and to cause Paul to induce the Seippels to enter into the transaction, than the typical outside professional, whose involvement in the fraud is limited to providing assistance to its perpetrator.

**58.** *See* Compl. ¶¶ 10–23.

**59.** *Suez Equity Investors, L.P.,* 250 F.3d at 101.

**60.** *See In re Salomon Analyst AT&T Litig.,* 350 F.Supp.2d 455, 474 (S.D.N.Y.2004) ("It stretches neither the language of Rule 10b–5 nor the holding of *Central Bank* to treat a high-level executive who allegedly orchestrated and directly ordered a false representation as a primary violator along with the underling who actually mouthed or wrote the offending falsehood. Indeed, in *Global Crossing*, this Court found that, in highly unusual circumstances, even an outside professional who allegedly conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme could be liable as a primary violator on the same theory."); *In re Global Crossing, Ltd. Sec. Litig.,* 322 F.Supp.2d 319, 334 (S.D.N.Y.2004) ("Allegations that Andersen 'prepared, directed or controlled' ... false statements issued by Global Crossing place its involvement well beyond the realm of 'aiding and abetting' liability precluded by *Central Bank."*); *Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 94 F.Supp.2d 491, 509 (S.D.N.Y.2000) (" 'That the defendant must make a misrepresentation does not mean that the defendant must communicate that misrepresentation directly to the plaintiff. Rather, where the defendant has made a misstatement but used another actor to deliver the message, the defendant still may be liable as a primary violator.' ") (quoting *In re Kidder Peabody Securities Litigation,* 10 F.Supp.2d 398 (S.D.N.Y.1998)).

rather than on compliance with the federal securities laws.' " [61]

*Wright* also requires that the statements on which plaintiffs rely were publicly attributable to defendants, in advance of the decision to enter into the transaction. When the Complaint is read in the light most favorable to the plaintiffs, this requirement is satisfied. The Seippels allege facts showing that they were aware of Deutsche Bank and Brown & Wood's participation in the scheme, and that they relied on Paul's representations regarding defendants' participation as if made by defendants. With respect to Brown & Wood, for example, the Seippels allege that "[t]he Defendants, acting through [ ] Paul, represented to the Seippels that [ ] COBRA was 100 percent legitimate, and backed by two blue chip law firms (Brown & Wood and Jenkens & Gilchrist) that had independently and objectively reviewed COBRA." [62] The Seippels allege that Paul's representations regarding the independent role played by Brown & Wood were fraudulent. [63] Similarly, the Seippels allege that they were aware of Deutsche Bank's participation in COBRA prior to their entry into the transaction, and that they relied on Paul's alleged misrepresentations regarding the manner in which Deutsche Bank would carry out the COBRA transactions. [64] In addition, Deutsche Bank communicated directly with the Seippels, in furtherance of the alleged conspiracy and prior to the Seippels' COBRA transaction, when it provided the Seippels with "investment advice regarding which foreign currency options to buy and sell." [65]

It can be inferred from the Complaint that Paul was speaking on behalf of and at the behest of defendants, and that the Seippels understood him to be speaking on their behalf and at their behest. The Seippels have thus alleged that defendants made misrepresentations, through Paul, that they knew or should have known that those misrepresentations would be communicated to potential purchasers of COBRA, and that those statements were indirectly attributable to them. These allegations are sufficient to survive a motion to dismiss. Whether defendants were in fact sufficiently responsible for Paul's statements to establish their liability as primary violators is a question that must be resolved on a motion for summary judgment or at trial.

### D. Deutsche Bank's Motion to Dismiss Sharon Seippel's Rule 10b–5 Claim for Lack of Standing

 Only the purchaser or seller of a security has standing to sue under Rule 10b–5. [66] In its August 25, 2004 Order, this Court held that the fraud alleged by the Seippels was 'in connection with' the exercise of stock options granted to William Seippel by his former employer, and the sale of the resulting stock, which gave rise to the taxable gains the COBRA strategy was intended to reduce. [67] Deutsche Banks argues that, because William Seippel, not

---

**61.** *In re Global Crossing,* 322 F.Supp.2d at 333 (quoting *In re Enron Corp. Sec., Deriv. & ERISA Litig.,* 235 F.Supp.2d 549, 587 (S.D.Tex.2002)).

**62.** Compl. ¶ 29. *See also id.* ¶ 21 ("the Defendants agreed that the accounting firms and other persons, including Deutsche Bank and Ernst & Young, who would solicit taxpayers to participate in COBRA ... would orally present the legal opinion of Brown & Wood [ ] to prospective COBRA participants.").

**63.** *See id.* ¶ 29.

**64.** *See id.* ¶¶ 31–36, 43, 47, 82.

**65.** *Id.* ¶ 47. Brown & Wood did not communicate directly with the Seippels until March 2000, at which point the Seippels had already entered into the COBRA shelter. *See id.* ¶ 57.

**66.** *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

**67.** August 25 Order at 374 (finding that "[t]he stock transaction was integrally related to the

Sharon Seippel, sold that stock, Sharon Seippel lacks standing to bring a Rule 10b–5 claim. The Seippels argue that Sharon Seippel has standing to sue because she "directly participated with her husband in the decision to exercise the options and sell the stock, and because the proceeds of the stock sales were deposited into their joint account and benefited her."[68] The Seippels rely principally on *Medline Industries Employee Profit Sharing & Retirement Trust v. Blunt, Ellis & Loewi, Inc.*[69] The plaintiff in *Medline* brought a Rule 10b–5 action alleging fraud in connection with the purchase of stock by her husband. The *Medline* court denied summary judgment for the defendant on the issue of standing. The court held that there was an issue of fact as to whether the plaintiff "sufficiently participated in [her husband's] stock purchase so as to qualify as a purchaser."[70]

Here, as in *Medline*, there are questions of fact as to whether Sharon Seippel sufficiently participated in her husband's decision to exercise his stock options and sell the resulting stock. It may reasonably be inferred from the Complaint that she did. For example, the Complaint alleges that

"the Seippels" realized a substantial gain from the sale of the stock.[71] The Complaint also alleges that all representations regarding COBRA were made to *both* Sharon and William Seippel.[72] When all reasonable inferences are drawn in favor of the plaintiffs, the Complaint suggests that Sharon Seippel's participation and consent was required for major financial decisions affecting the couple, such as the sale of William Seippel's stock.

Additionally, Sharon Seippel may have standing to sue on the basis of her involvement in the decision to enter into certain stock transactions that were required to carry out the COBRA strategy—specifically, the issuance of stock to William Seippel by WSWP Virginia Investors, Inc. ("WSWP, Inc."), the corporation formed by William Seippel to carry out the CO-BRA transaction. In its August 25, 2004 Order, this Court did not reach defendants' argument that the alleged fraud was 'in connection with' the issuance of WSWP, Inc. stock. In subsequent cases involving similar tax shelters, courts have held that there are issues of fact that may not be resolved on a motion to dismiss as to whether such stock constitutes a security.[73]

---

fraudulent scheme. Defendants contacted the Seippels, as part of their scheme, precisely because of his sale of stock, and took advantage of their knowledge of Mr. Seippel's planned securities transaction to induce him to take part in the COBRA transaction.").

68. Seippel Mem. at 21.

69. No. 89 C 4851, 1993 WL 13436, at *5–6 (N.D.Ill. Jan. 21, 1993).

70. Deutsche Bank attempts to distinguish *Medline* because in that case the husband placed the stock in the plaintiff's name, whereas there is no indication here that Sharon Seippel had an "actual ownership interest" in William Seippel's stock options. Deutsche Bank's Reply Memorandum of Law in Support of Motion to Dismiss at 9. In *Medline*, however, the court expressly held

that "[d]efendant's emphasis on the source of the funds and the name on the account [ ] is misplaced and does not resolve this issue. The actual source of funds is not determinative of 10b–5 standing. Likewise, the name on the brokerage account does nothing more than evidence Vicki Mills's beneficial interest in the securities. . . . *The determinative factor for 10b–5 standing [ ] is Vicki Mills's level of involvement in the decision to purchase Residential stock." Medline Indus., Inc.*, 1993 WL 13436, at *5 (emphasis added).

71. Compl. ¶ 25.

72. *See id.* ¶¶ 26–39.

73. *See Blythe v. Deutsche Bank*, No. 04 Civ. 5867, 2005 WL 1322739, at *4 (S.D.N.Y. June 1, 2005); *Ling v. Deutsche Bank*, No. 04 Civ. 4566, 2005 WL 1244689, at *5 (S.D.N.Y. May

The Complaint alleges that William Seippel formed WSWP, Inc., and that the stock in WSWP, Inc. was issued to him, and not to Sharon Seippel.[74] It may, however, be inferred from the Complaint that Sharon Seippel participated in the decision to create WSWP, Inc. and to issue the stock, and that any payments involved came from the couple's joint funds. These issues of fact preclude dismissal of Sharon Seippel's securities fraud claim at this stage.

### E. The Seippels' State Law Fraud Claim Is Not Time–Barred

Finally, Deutsche Bank moves to dismiss the Seippels' state law fraud claim as untimely. Under Virginia law, which is applicable to the Seippels' state law fraud claim, the statute of limitations for fraud is two years, and accrues "when such fraud ... is discovered or by the exercise of due diligence reasonably should have been discovered." [75] Deutsche Bank argues that the Seippels, with due diligence, should have discovered the alleged fraud in September 2000 when the IRS issued Notice 2000–44, and that their claim therefore expired in 2002, prior to the filing of the Complaint.

██ "Due diligence" means " '[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.' " [76] As discussed above, Notice 2000–44 does not explicitly refer either to COBRA or to defendants. Defendants do not point to any press coverage or other 'storm warnings' that would have driven reasonably prudent taxpayers to search for and analyze technical IRS Notices in an attempt to second-guess the advice of their tax lawyers. Deutsche Bank's motion is denied.

## IV. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are denied. The Clerk of the Court is directed to close these motions [# 79, 87].

SO ORDERED.

---

26, 2005); *Heller v. Deutsche Bank*, No. 04 Civ. 3571, 2005 WL 525401, at *4 (E.D.Pa. Mar.3, 2005). *Blythe* and *Heller* expressed no view on whether, if such stock constituted a security, its role in the tax shelter at issue would give rise to an action for securities fraud. *Ling* held that transactions in the stock of the S corporations and LLCs created to carry out the tax shelter at issue in that case were "integral steps" in the strategy. *Ling*, 2005 WL 1244689, at *5.

**74.** See Compl. ¶ 48 (*"Will Seippel* formed [WSWP, Inc. and] WSWP, Inc. issued stock, in exchange for payment, to Will Seippel and another individual who was not Sharon Seippel.") (emphasis added).

**75.** Va.Code. Ann. § 8.01–249.

**76.** *STB Mktg. Corp. v. Zolfaghari*, 240 Va. 140, 144, 393 S.E.2d 394 (1990) (quoting Black's Law Dictionary 411 (rev. 5th ed.1979)).