**Ira NATHEL and Sheldon Nathel, Plaintiffs,**

v.

**Richard SIEGAL, George Coleman, Harvey Josephson, Robert A. Trevisani, Paul Howard, Richard S. Guralnick, Schain Leifer Guralnick, Bistate Oil Management Corporation, SS & T Holding Co., LLC, Palace Exploration Co., TAH Drilling Co., Inc., TAQ Drilling Co., Inc., Oil and Gas Title, Holding Corp., John Does 1–20, John Doe Corporations 1–20, John Doe LLCs 1–20, and John Doe LLPs 1–20, Defendants.**

No. 07 Civ. 10956(LBS).

United States District Court, S.D. New York.

Oct. 20, 2008.

Kathleen E. Wright, Steven Gary Storch, Storch Amini & Munves, P.C., New York, NY, for Plaintiffs.

Lisa Christine Solbakken, Michelle A. Rice, Sean R. O'Brien, Stanley Samuel Arkin, Justin M. Sher, Arkin Kaplan Rice LLP, Daniel Victor Shapiro, Scott M. Himes, Stillman, Friedman & Shechtman, P.C., Daniel L. Carroll, Ingram Yuzek Gainen Carroll & Bertolotti, LLP, John H. Eickemeyer, Vedder Price P.C., New York, NY, for Defendants.

### MEMORANDUM AND ORDER

SAND, District Judge:

Before the Court are four motions to dismiss in response to Plaintiffs Ira and Sheldon Nathel's ("Plaintiffs") allegations that they are victims of a fraudulent scheme whereby Defendants induced them to invest in partnerships for oil and gas drilling, promising legitimate tax deductions and substantial returns from oil and gas revenues. Defendants Richard Siegal, Paul Howard, Bistate Oil Management Corporation, SS & T Holding Co., LLC, Palace Exploration Company, TAH Drilling Co., Inc., TAQ Drilling Co., Inc., and Oil and Gas Title Holding Corp. (collectively "Palace Defendants"), Defendant Harvey Josephson, Defendants Robert Trevisani and George Coleman, and Defendants Richard Guralnick and Schain Leifer Guralnick (collectively "Guralnick Defendants") bring these motions to dismiss Plaintiffs' second amended complaint ("SAC").

Jurisdiction is alleged by virtue of federal question, 28 U.S.C. § 1331, as the action involves a claim arising under federal securities law, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The partnership investments at issue are investment contracts which constitute securities as defined in 15 U.S.C. § 78b(a)(1) and applicable case law. The complaint alleges supplemental jurisdiction under 28 U.S.C. § 1367 with respect to the state law claims.

Plaintiffs filed their first complaint in December 2007 and an amended complaint later that month correcting the listing of Defendants' names in the action. The first and second complaints alleged Section 10(b) securities fraud against the Palace Defendants, Josephson, the Guralnick Defendants, and Coleman and Trevisani, common law fraud and negligent misrepresentation against all Defendants, and breach of fiduciary duty, breach of contract, and professional malpractice against some of the defendants. The Palace Defendants, Josephson, Coleman and Trevisani, and the Guralnick Defendants filed four separate motions to dismiss. Plaintiffs cross-moved to file a second amended complaint

in May 2008, adding claims against some of the Defendants and dropping other claims.

Rule 15(a) of the Federal Rules of Civil Procedure provides that parties may amend their pleading once as a matter of course and otherwise only by leave of the court, and that leave to amend is freely granted when justice so requires. When a cross-motion for leave to file an amended complaint is made in response to a motion to dismiss, "leave to amend will be denied as futile only if the proposed new claims cannot withstand a 12(b)(6) motion." *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir.2001). As set forth below, the claims in the SAC are not futile, and as Defendants have not set forth reasons why amendment of the complaint would be prejudicial to them, the cross-motion to amend is granted.

## I. Background [1]

Plaintiffs, joint owners of a wholesale fruit and vegetable company, allege that they were fraudulently induced into investing a total of over $1.6 million in partnerships. The partnerships were formed to invest in oil and gas drilling and production interests. Plaintiffs were told that their investments would bring returns in the form of tax deductions and oil revenues. In 2003 and 2004, Plaintiffs invested in three partnerships—Indian Village, Condor, and Hurricane—and Plaintiffs began investing in other virtually identical partnerships starting in 2001 based upon alleged misrepresentations which continued through 2004. Defendant Richard Siegal is the creator and promoter of these investments, and Defendant Paul Howard was a close colleague of Siegal and an officer in the companies who was privy to the same information as Siegal. Siegal and Howard allegedly knew, at the time they induced Plaintiffs to invest through written offering memoranda and oral representations, that Plaintiffs could not possibly receive tax deductions or recover their investments through oil revenues. Siegal and Howard allegedly had access to drilling reports and other inside information showing that the wells proposed to be drilled by the partnerships were already dry or abandoned and could not provide oil revenues or qualify as intangible drilling costs ("IDC") for tax purposes.

Defendant Harvey Josephson, a trusted accountant and financial advisor for the Plaintiffs, strongly encouraged Plaintiffs to invest in the partnerships, assuring Plaintiffs through a series of meetings beginning in 2001 and continuing through 2003, that he was familiar with the partnerships and that Siegal was a competent businessman. Defendants George Coleman and Robert Trevisani allegedly worked with Siegal to make the partnerships appear legitimate, by holding themselves out as oil and gas experts qualified to serve as Managing Partners. In fact, Coleman and Trevisani were not oil experts who would participate in oil and gas site selection, they were respectively, the CEO of a children's day camp and a practicing attorney. Siegal and his companies and partnerships retained Defendants Richard Guralnick, a certified public accountant, and his firm, Schain Leifer Guralnick, to prepare tax returns, including the K–1s provided to each investor.

Plaintiffs invested in a total of nine partnerships, with the first investment made in 2001 and the last in 2005. Plaintiffs bring this action based on three of the partnerships—Indian Village, Condor, and Hurricane. Plaintiffs allege that they became aware of the fraud in or about November 2006, when Richard Byllott, Plain-

---

1. The facts stated in this section are as alleged by the Plaintiffs in the SAC.

tiffs' business affairs and tax agent, received a written notice from an IRS agent that Plaintiffs' investments in the partnerships were being audited and that the partnerships were taking illicit tax deductions. Shortly afterward, Byllott informed Defendant Howard that Plaintiffs were being audited and that the IRS had asked Byllott to forward to them promotional materials for the partnerships. Howard instructed Byllott not to send the Partnership Investment Proposals to the IRS and that if he did so, to remove the first five pages, suggesting that the IRS would "see something they don't like" in those pages. (SAC ¶ 87.) Plaintiffs have subsequently received a notice from New York State tax authorities indicating that their deductions have been disallowed and that penalties will be imposed.

## II. Discussion

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a district court must read the complaint generously, accepting as true the factual allegations in the complaint and making all reasonable inferences in favor of the nonmoving party. *See Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (internal citations omitted). When considering a motion to dismiss, courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007). A court should grant dismissal only if, after viewing the nonmovant's allegations in the most favorable light, "it appears beyond doubt that the [nonmovant] can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (citation omit-

ted); *accord Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### A. Securities Fraud Claims

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5 promulgated under the Act forbids the use, "in connection with the purchase or sale of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates ... as a fraud or deceit." 17 CFR § 240.10b–5. Plaintiffs must bring a section 10(b) claim at the earlier of (1) two years after the discovery of the facts constituting the violation or (2) five years after such violation. 28 U.S.C. § 1658(b).

To state a cause of action under Section 10(b) and Rule 10b–5, plaintiffs must show that defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. *See In re IBM Corporate Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998). The claim must satisfy a heightened pleading requirement by "stat[ing] with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b); *see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (citations omitted).

The Palace Defendants and Josephson argue that the Section 10(b) claim should be dismissed for several reasons. First, they argue that it is barred by the statute of limitations. They also allege that Plaintiffs' complaint suffers from the following pleading defects: it fails to allege fraudulent activity "in connection with" the purchase or sale of securities, it insufficiently pleads proximate cause, and it inadequately pleads scienter on the part of Defendants Siegal, Howard, and Josephson.

### 1. Statute of Limitations

Defendants argue that Plaintiffs' Section 10(b) claim is barred by the statute of limitations because conversations with Defendant Josephson in 2001 and Defendant Siegal in 2002 should have made Plaintiffs aware of the suspicious nature of the investment partnerships. (Palace Mot, Dismiss First Am. Compl. 10.)

■■■ A Section 10(b) securities fraud claim expires at the earlier of (1) two years after the discovery of the facts constituting the violation or (2) five years after such violation. 28 U.S.C. § 1658(b). The two-year period begins to run "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded." *LC Capital Partners, L.P. v. Frontier Ins. Group,* 318 F.3d 148, 154 (2d Cir.2003). Determination of this so-called "inquiry notice" is an objective test, and dismissal of a securities fraud claim is proper "where pleadings disclose facts sufficient to have placed the plaintiff on inquiry notice of the alleged fraud prior to the . . . cutoff." *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 638 (S.D.N.Y.1993) (internal quotation and citation omitted). The defendant must show that the circumstances suggested to plaintiff that it was probable, not merely possible, that he was defrauded. *In re Integrated Resources,* 815 F.Supp. at 638.

■■■ Courts in this district have previously noted that "per se rules of actual or inquiry notice—such as a rule that notices of disallowances from the IRS are always enough to put an investor on notice of fraud" are not always helpful and that instead, courts should evaluate factors such as "the content of the notice, the nature of the loss, and the nature of the fraud." *131 Main St. Assocs. v. Manko,* 897 F.Supp. 1507, 1515–16 (S.D.N.Y.1995) (finding RICO claims concerning tax shelters timely because communications from management and related IRS investigation were ambiguous and did not put plaintiffs on notice of fraud). The "storm warnings" that trigger inquiry notice of potential fraud include court filings and media reports. *Masters v. GlaxoSmithKline,* 271 Fed.Appx. 46, 49 (2d Cir.2008) (ongoing patent litigation provided inquiry notice in securities fraud claim relating to viability of drug patents); *Shah v. Meeker,* 435 F.3d 244, 249–50 (2d Cir.2006) (*Fortune* magazine article about potential conflicts of interest with Morgan Stanley analysts sufficient to provide inquiry notice).

Financial data can also put plaintiffs on inquiry notice. In *Armstrong v. McAlpin,* for example, prospectuses and financial statements showed dramatic increases in commissions and in excess of expenditure over income within a short time frame. The Second Circuit characterized these as "readily recognizable earmarks of financial shenanigans" that created a duty of inquiry, and imputed notice of fraud to the plaintiffs. 699 F.2d 79, 88 (2d Cir.1983) (noting commission increases from $5,109 in 1967 to $785,861 in 1969, and an increase of excess of expenditure over income from $173,727 to $929,347 in the

same time period). Information contained in an offering memorandum detailing the structure and business of a partnership may also suffice to put a party on inquiry notice of potential fraud. *Zaloom v. Trupin,* No. 86 Civ. 465, 1992 WL 279365, at *4, 1992 U.S. Dist. LEXIS 14825, at *11–*12 (S.D.N.Y. Sept. 29, 1992) (finding on summary judgment that security claims were time-barred because plaintiffs were put on notice at time of receiving offering prospectus); *see also Rohland v. Syn–Fuel Assocs.—1982 Ltd. Partnership,* 879 F.Supp. 322, 330 (S.D.N.Y.1995) (finding 10(b) claims time-barred because tax firm memoranda informed plaintiffs of high-risk nature of tax shelter partnership investments).

Where warning signs such as IRS public notices "are accompanied by reliable words of comfort from management[,] such statements are among the factors that must be considered" when evaluating whether that would have suggested a probability of fraud. *Seippel v. Sidley, Austin, Brown & Wood, LLP,* 399 F.Supp.2d 283, 291 (S.D.N.Y.2005). In *Seippel,* the court found that plaintiffs, typical taxpayers who invested in a tax shelter, "were entitled to rely on defendants' [law and accounting firms] advice regarding technical issues of tax law." *Id.* Because defendants in that case had misleadingly informed plaintiffs that the IRS public guidance notices did not apply to the tax shelter, and the details of the tax issues "required more legal expertise than can be demanded of ordinary taxpayers," the court found that the IRS notices did not give rise to inquiry notice of fraud. *Id.* at 292 (denying motion to dismiss). However-er, assurances given after constructive no-tice of fraud such as an IRS valuation report is not sufficient to toll the statute of limitations. *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,*

815 F.Supp. at 640 (citing *Zola v. Gordon,* 685 F.Supp. 354, 365 (S.D.N.Y.1988)).

Plaintiffs' allegations in this case indicate that they were not put on inquiry notice of the fraud until the time of the IRS agent's contact in November 2006, and thus that the case was within the statute of limitations when the complaint was filed in December 2007. (Pls.' Mem. Opp'n Mot. Dismiss 20; SAC ¶ 85.) Unlike the circumstances in *Armstrong,* a case upon which Defendants rely, Defendants in this case have not argued that there were blatant financial indicators of fraud in the partnership investment proposals. Furthermore, the SAC alleges that Defendants held the managing partners out to be oil and gas industry experts and made misleading statements upon which Plaintiffs were arguably entitled to rely. (SAC ¶¶ 46, 53.) Defendant Siegal also "misleadingly informed Byllott [the corporate controller for Plaintiffs' corporation] that the partnerships had never lost an audit." (SAC ¶ 38.) Defendant Josephson allegedly assured plaintiffs that the promissory notes would never come due "because the oil and gas revenues paid down the notes." (SAC ¶ 35.) As investors of ordinary intelligence, and having no special expertise in the oil and gas industry, Plaintiffs were entitled to rely upon the information from Defendants, and thus did not receive notice of potential fraud until November 2006 when they were contacted by IRS agents. (SAC ¶ 85.)

Plaintiffs' Section 10(b) claims are timely, and we now turn to the alleged pleading defects as put forth by the Palace Defendants and by Josephson.

### 2. Identifying the Fraudulent Statements

Rule 9(b) of the Federal Rules of Civil Procedure requires that fraud be pleaded with particularity. Fed.R.Civ.P. 9(b); *see Novak v. Kasaks,* 216 F.3d 300, 306 (2d

Cir.2000). Defendant Josephson argues that the SAC fails to specify the fraudulent statements and where and when those statements were made.

■ The SAC, though not a model of clarity, does allege specific statements made by Josephson during a series of meetings with Plaintiffs and their representative, Byllott. Josephson represented that he was "very familiar" with the Siegal partnerships, that "he had been putting his other clients in them," and that "Siegal and Howard knew what they were doing." (SAC ¶¶ 34, 115.) As a tax advisor, Josephson assured Plaintiffs that they would receive tax deductions, that "oil and gas revenues paid down the notes," and that notes in similar partnerships had never been exercised. (SAC ¶¶ 32, 35.) The SAC alleges that Josephson made these statements "recklessly" and "without any basis" because he "made no investigation" into the validity or existence of the wells or the tax status of the investments. (SAC ¶ 35.)

The time and place of these statements are also pled with sufficient particularity. The SAC alleges that Josephson made these representations in a July 2001 meeting with the Plaintiffs where he presented the investment as a way of reducing their tax burden. Josephson put Plaintiffs in contact with Siegal and Howard and attended monthly meetings at Plaintiffs' offices and he repeated these representations about the investments in a June 2003 meeting. (SAC ¶¶ 32, 38, 40.)

### 3. Misrepresentation "In Connection With" a Purchase of Securities

■ The Palace Defendants argue that the complaint does not identify any fraudulent act taken by either Siegal or Howard "in connection with" Plaintiffs' purchase of a security. Defendants allege that the only representation that coincides with a purchase of a security is Siegal's statement that the investment partnership structure had been subject to scrutiny by tax authorities. (Palace Mot. Dismiss First Am. Compl. 11.) Defendants further argue that their alleged failure to purchase securities for Plaintiffs does not support a claim for fraud because Plaintiffs merely assert an *attempt* to invest in securities, and not a purchase or sale of securities. (Palace Mem. Opp'n Mot. SAC 16.) [2]

■ To violate the anti-fraud provisions of federal securities law, the fraud must be "an integral part of the purchase of securities," for example, where it "directly involve[s] the consideration for the contract and affect[s] the contemplated consummation of the transaction." *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir.1986) (citing *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir.1967)). However, the misrepresentations and omissions need not coincide precisely with a securities transaction. The Supreme Court has given the "in connection with" phrase a "broad interpretation" such that "it is enough that the fraud alleged 'coincide[s]' with a securities transaction." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 84, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). For example, "a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b–5." *SEC v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).

In this case, Plaintiffs allege a number of misrepresentations and omissions made

---

**2.** Defendant Josephson adopts the Palace Defendants' arguments on this point, stating that the complaint does not tie any of Josephson's statements to any particular investment. (Josephson Mem. 8.)

before they invested in each partnership. The SAC alleges that before Plaintiffs' investment, Defendants Siegal and Howard provided Plaintiffs with offering memoranda (referred to as "Investment Proposals") which made false representations, including the statement that "in lieu of receiving the quarterly distributions in full, the partners could elect to assign ... 67% of their future distributions with which the Partnership would purchase marketable securities which would increase in value." (SAC ¶¶ 42, 48–49.) Plaintiffs further allege that Siegal and Howard knew, at the time they provided the Investment Proposals to Plaintiffs, that the partnerships would not purchase marketable securities with the withheld distributions. (SAC ¶ 49.)

■ The allegation that the Palace Defendants falsely promised to purchase securities when they never intended to do so, and misrepresented the partnerships' value because they knew that many of the oil sites were dry and could not produce oil revenues, is sufficient in pleading fraud "in connection with" a purchase of securities. Similarly, the SAC sufficiently pleads that Josephson's statements were in connection with the investments. The SAC alleges that Josephson's representations in 2001 encouraged the Indian Village investment, and his repeated statements in subsequent meetings, including a 2003 meeting, were statements that led up to and induced Plaintiffs' investments in the partnerships. (SAC ¶¶ 31–41.)

## 4. Scienter

According to the motions to dismiss, the SAC fails to allege that Defendants acted with scienter. The Palace Defendants argue that there are no particular facts supporting a theory of misconduct rather than mere imperfect economic forecasting. (Palace Mem. Opp'n Mot. SAC 11–13.)[3]

■ Plaintiffs' Section 10(b) claim must allege that the Defendants acted with scienter. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The inference that a defendant acted with scienter need not be irrefutable, so long as "a reasonable person would deem the inference ... cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

■ Though litigants and courts "need and should not employ or rely on magic words such as 'motive and opportunity,'" pre-PSLRA case law continues to provide guidance for how plaintiffs can demonstrate scienter. *Novak*, 216 F.3d at 311. A "strong inference" that defendants acted with scienter arises, for example, where a plaintiff sufficiently alleges that a defendant benefited in a concrete and personal way from the fraud, engaged in deliberately illegal behavior, knew facts or had access to information suggesting his public statements were not accurate, or failed to check information that he had a duty to monitor. *Id.* Furthermore, opinions or predictions can be the basis for scienter "if they are worded as guarantees ... or if the speaker does not genuinely or reasonably believe them." *In re IBM Corporate*

---

**3.** Defendant Josephson adopts the arguments made by the Palace Defendants on this point, stating that the SAC does not provide any factual basis for the belief that Josephson was compensated by Siegal for securing investments and that Plaintiffs do not allege that Josephson's statements were false. (Josephson Mem. 7; Josephson Mem. Opp'n SAC 8.)

*Sec. Litig.,* 163 F.3d 102, 107 (2d Cir.1998) (citations omitted).

██ The SAC contains sufficient allegations of scienter on the part of the Palace Defendants. It alleges that Siegal, the creator of the partnerships, and Howard, a promoter, had access to internal documents that contradicted their public statements to Plaintiffs. The investment proposals furnished by Siegal and Howard state that "[r]ates of return can unquestionably be earned on moneys which would otherwise be paid to varying tax authorities" and that an investor "can expect an average annual cash flow of approximately 10–15% of the cash funds invested" for a period of "10–12 years, as that is the average expected life of the wells to be drilled." (Indian Village Investment Proposal 1–2.) However, drilling reports for the partnerships, to which Siegal and Howard allegedly had access, showed that a number of wells were dry or abandoned or already drilled before Plaintiffs had invested. (SAC ¶ 43, 47.) Thus, the SAC states facts giving rise to a "strong inference" that Palace Defendants knew at the time they sent the offering memoranda to induce Plaintiffs to invest, that Plaintiffs could not recover oil and gas proceeds, and that the claimed IDC deductions would be disallowed because such deductions are not permissible based on drilling costs incurred prior to investment. (SAC ¶ 43, 47, 49.)

██ As against Josephson, the SAC sufficiently pleads a duty to monitor, an allegation that is still relevant in determining scienter. *Novak,* 216 F.3d at 309, 311. *Rolf v. Blyth* provides a good example. In that case, a financial services firm assured a plaintiff that the investment advisor "knew what he was doing" in making stock purchase decisions. However, these "representations were conclusorily made ... without investigation" and the court found

this to be reckless and sufficient for scienter. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir.1978). Similarly, the SAC alleges that Josephson, as a trusted advisor, assured Plaintiffs of the tax benefits and likelihood of oil and gas profits, even though Josephson did not investigate the tax deductions or the wells and knew virtually nothing of the investment, all while he was allegedly being secretly compensated by Siegal to promote the partnerships. (SAC ¶¶ 34–36.)

### 5. Reasonable reliance

██ A 10(b) plaintiff must allege that he reasonably relied on the alleged misrepresentation in making his investment. *Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1032 (2d Cir.1993). To assess the reasonableness of a plaintiff's reliance, courts evaluate the "entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir. 2003). This Circuit has found that a plaintiff is precluded from showing reasonable reliance where he presents himself as a sophisticated investor and fails to ask for the defendant company's largest investment to be included among the extensive warranties and representations in the stock purchase agreement. *Emergent Capital Inv. Mgmt., LLC,* 343 F.3d at 196.

██ Palace Defendants argue that Plaintiffs failed to perform basic due diligence into the challenged investment. (Palace Mem. Opp'n SAC 15.) While the Second Circuit has previously held that an investor is not justified in relying on a misrepresentation "if, through minimal diligence, the investor should have discovered the truth" this has been in a context where documents have been readily available or

where the plaintiff was a sophisticated investor. *Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir.2005) (affirming dismissal of 10b–5 claim because detailed letters from defendants included instructions on how shareholders could acquire additional information regarding a share-exchange service); *see also Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98–99 (2d Cir.1997) (finding the plaintiff, a "sophisticated" licensing operation, was unreasonable in relying on defendant's representation that it controlled all rights to Andy Warhol's works). In contrast, the Nathels are fruit wholesalers and have no knowledge or experience in the oil and gas business. Moreover, the SAC alleges that the Nathels did not have access to the drilling records which would have raised questions about the soundness of the investment.

The Palace Defendants argue that the oil business is notoriously risky and that Plaintiffs could not reasonably rely on an assumption that they would not lose money. (Palace Mem. Opp'n SAC 14–15.) However, the SAC does not allege fraud based merely on an assumption that money could be made with no risk. Plaintiffs allege that Defendants falsely represented that tax deductions and oil and gas revenues could be expected, when in fact some of the wells had already been drilled prior to the investment and thus could not possibly qualify for tax deductions or produce oil and gas proceeds. (SAC ¶ 43.) The question of whether Plaintiffs' reliance was reasonable is fact-intensive and not suited for resolution on a motion to dismiss.

■ Josephson also argues that reliance has not been established, stating that his statements in 2001 are not tied to the investments on which Plaintiffs allege a loss and that Plaintiffs' reliance on Siegal and Howard, and the Investment Proposals, negate their reliance on Josephson.

(Josephson Mem. Opp'n SAC 12–13.) As noted above, the SAC pleads that Josephson's statements in 2001, which were reiterated in 2003, caused Plaintiffs to enter into their investments in the Siegal companies. That Plaintiffs also relied on statements made by other defendants does not negate their reliance on Josephson, who they allege was their trusted accountant and advisor. Furthermore, as stated in *Emergent Capital,* courts must consider the sophistication of the parties in evaluating the reasonableness of reliance. In this case, Josephson knew that his clients were fruit wholesalers inexperienced in the oil and gas business and were relying upon Josephson for his investment and tax advice. (SAC ¶ 101.) Reliance is sufficiently pled with respect to Josephson.

### 6. Loss causation

A federal securities fraud claim must also prove loss causation. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir.2005); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994). As codified by the PSLRA, the plaintiff carries the "burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). It is not enough to allege that at the time of purchase of the security, the price was artificially inflated due to the defendant's misrepresentation or omission. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

Palace Defendants argue that loss causation cannot be established with respect to the loss of money invested in the partnerships. Specifically, they argue that the SAC provides no factual allegations concerning the amount of the distribution checks received by Plaintiffs, or of the value of oil wells in which Plaintiffs invest-

ed through the partnerships. Defendants further argue that the SAC does not allege facts showing Plaintiffs suffered economic losses because of Defendants' lack of experience or failure to purchase securities for them. (Palace Mem. Opp'n Mot SAC 9–11.)

As this Circuit has explained, loss causation is the "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003). It has been roughly analogized to the tort law concept of proximate cause, in that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173. The loss causation inquiry asks whether the loss was a "foreseeable outcome" of the omission and is "intended to fix a legal limit on a person's responsibility, even for wrongful acts." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001). The existence of intervening events that break the chain of causation, such as a general fall in the price of stocks in a certain sector, is a "matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital*, 343 F.3d at 197.

In *Lentell*, the plaintiff argued that Merrill Lynch's "buy" and "accumulate" recommendations concealed the risk of significant devaluation of two securities. The Court of Appeals for the Second Circuit disagreed, finding that the plaintiff failed to plead loss causation adequately because Merrill's research reports were "full of (unchallenged) analysis" suggesting that the securities at issue were volatile investments subject to sudden and substantial devaluation. *Lentell*, 396 F.3d at 177. In contrast, where some or all of the risk is concealed by the defendant's misrepresentation or omission, courts have found loss causation sufficiently pled. In *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, the defendant invited the plaintiff to invest in a company, SAM Group, and discouraged the plaintiff from researching into the background of SAM's principal executive. 250 F.3d 87, 94 (2d Cir.2001). Instead, the defendant presented the plaintiff with a modified version of a background report he had commissioned, which omitted discussion of the executive's prior bankruptcy filings, pending civil suits, and tax liens—all of which, the plaintiff argued, created a cash flow crisis that led to SAM's failure. *Id.* The court in *Suez Equity* reversed the dismissal of the securities fraud claim, rejecting the trial court's reasoning that since the cash flow problems predated the plaintiffs' investment in SAM, the defendant's fraud was not the cause of the plaintiff's loss. Instead, the appellate court found that the plaintiff adequately alleged that the executive's lack of business skills caused the financial troubles. *Id.* at 95.

Construing all facts in the light most favorable to Plaintiffs, Plaintiffs have sufficiently pled loss causation. The SAC alleges that the misstatements and omissions about the oil sites concealed the risk of loss. As alleged in the SAC, the Defendants represented that investors would "be afforded a substantial active tax loss," that drill sites will be "carefully chosen by the Managing Partner," that "an average annual cash flow of approximately 15% and often greater" can be expected, and that withheld distributions would "fund the purchase of the securities." (SAC ¶ 42(c)-(d); Indian Village Drilling Co. Investment Proposal 2, 4.) Contrary to these misstatements, Defendants allegedly "knew from the books and records and drilling re-

ports" that "the IDC would not be allowable because many of the sites had been drilled before the Partnerships were constituted" and that "investors could not recover their investments from oil and gas revenues" since many of the sites "had already been abandoned, were dry or were capped before Plaintiffs invested." (SAC ¶ 43.) The high risk of loss of Plaintiffs' investment was actively concealed by these misrepresentations, just as the risk of a cash flow crisis was concealed by defendants in *Suez Equity, supra*.

The SAC alleges that Plaintiffs' investment in Indian Village of $336,000, in Condor of $572,000, and in Hurricane of $1,665,200, have "virtually all been lost" because the Defendants concealed information suggesting that the oil sites could not possibly have generated revenues (SAC ¶¶ 65, 74, 81.) Whether some of these losses are offset by distributions received is a question of fact. Based on these allegations, the SAC sufficiently pleads a casual link between the omissions and misrepresentations of Defendants and the harm suffered by Plaintiffs.

For the same reasons as stated above, Defendant Josephson's arguments against loss causation are not persuasive. The federal securities claims against the Palace Defendants and Josephson are sufficiently pled to survive the motions to dismiss.

### B. Common Law Fraud Claims

■ In New York, common law fraud is defined as a "representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury." *Suez Equity*, 250 F.3d at 104–05 (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 302 N.Y.S.2d 799, 250 N.E.2d 214, 217 (1969)). Because this Court finds that the federal

securities law claim is sufficiently stated as against the Palace Defendants and Josephson, the common law fraud claims also survive the motion to dismiss.

### C. Aiding and Abetting Common Law Fraud

■ The SAC alleges that George Coleman and Robert Trevisani, managing partners for the various Siegal partnerships, aided and abetted the Palace Defendants' common law fraud. To establish a claim for aiding and abetting common law fraud in New York, a plaintiff must allege (1) the existence of a fraud, (2) that the defendant knew of the fraud, and (3) that the defendant provided substantial assistance to advance the commission of the fraud. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir.2006). Coleman and Trevisani argue that the SAC fails to allege that they were ever aware that codefendants made fraudulent misrepresentations regarding their expertise in the oil and gas industry. (Coleman Mem. Opp'n SAC 4.) They further argue that merely allowing their names to be used in partnership documents is not affirmative assistance in commission of the fraud. (Coleman Mem. Opp'n SAC 8.)

■ This Court finds from its discussion above that the first element of an underlying fraud is sufficiently well-pled to survive the motion to dismiss. To plead the second element, that defendants knew of the fraud, a plaintiff must allege actual knowledge—allegations of constructive knowledge or recklessness are insufficient. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F.Supp.2d 349, 367 (S.D.N.Y.2007). The allegation of actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud. In *JP Morgan Chase Bank v. Winnick*, defendants were accused of inflating earnings through bogus network capacity

swaps with other telecommunications providers. 406 F.Supp.2d 247, 249 (S.D.N.Y. 2005). The court found that the complaint sufficiently alleged actual knowledge on the part of the defendant company's general counsel, on the basis of three emails copied to the general counsel that stated in somewhat vague terms that the company was "taking capacity," which it would prefer not to do, in order to meet revenue targets. *Id.* at 254.

In contrast, where the defendant was an auditor for a business and had access to books and records that may have suggested fraud, the mere access to documents could establish constructive knowledge but not actual knowledge. *VTech Holdings Ltd. v. PriceWaterhouseCoopers LLP*, 348 F.Supp.2d 255, 269–70 (S.D.N.Y.2004); *accord Nat'l Westminster Bank v. Weksel*, 124 A.D.2d 144, 511 N.Y.S.2d 626 (1987) (allegation that law firm had access to client's papers is not sufficient to plead actual knowledge). Even where a bank was on notice of "red flags" that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud. *Ryan v. Hunton & Williams*, No. 99 Civ. 5938, 2000 WL 1375265, at *9, 2000 U.S. Dist. LEXIS 13750, *26–*27 (E.D.N.Y. Sept. 20, 2000).

■ Unlike plaintiffs in *VTech* and *National Westminster*, the Nathels allege that Coleman and Trevisani had more than mere access to documents. Coleman and Trevisani allegedly signed the Partnership Agreements which listed them as Managing Partner. Those agreements represented them as having a controlling role in the selection of drill sites, the purchase of production equipment, and the determination of whether partnership property should be explored, drilled, sold, or abandoned. (SAC ¶¶ 42(e), 46; Indian Village Partnership Agreement 5, Ex. 7 Himes Decl.) [4] The SAC also alleges that Coleman and Trevisani knew of their own inexperience in the oil and gas industry and that Siegal would actually control the partnerships, yet they permitted their names to be used by Siegal in the Investment Proposals and the Partnership Agreements so that Siegal could make the partnerships appear legitimate. (SAC ¶¶ 46, 125.)

Reading the SAC together with the Investment Proposals and Partnership Agreements, and interpreting the allegations in the light most favorable to Plaintiffs, Plaintiffs sufficiently allege that Coleman (operator of a children's camp) and Trevisani (a practicing attorney) had actual knowledge of fraud when they signed agreements naming them as managing partners who would carefully select oil sites and manage the affairs of the partnership, when they knew that they would not be performing those duties. This actual knowledge relates to the core of the alleged fraud—that the partnerships were not investing in viable oil interests and that Coleman and Trevisani's names and supposed expertise were being used to de-

---

**4.** The Investment Proposals, portions of which are quoted in the SAC, refer to Coleman and Trevisani's role in selecting drilling sites. For example, the Indian Village proposal states that "drillsites have been carefully chosen by George Coleman ("Coleman"), the Managing Partner, in conjunction with Palace, to provide a balanced oil and gas drilling program" and the Hurricane proposal states the same with respect to Trevisani.

(Indian Village Investment Proposal 2; Hurricane Drilling Co. Investment Proposal 2.) No other individual is mentioned by name in the investment proposals.

Furthermore, the partnership agreement stated that "[t]he Managing Partner will receive ... a management fee for services, expertise, and supervision of the operations of the Partnership." (Indian Village Partnership Agreement 8.)

ceive investors into believing that the partnerships were directed by competent and experienced managing partners. (SAC ¶¶ 76, 126.)

The third element of aiding and abetting is that a defendant must substantially assist in advancing the commission of the fraud. Under New York law, substantial assistance occurs "when a defendant affirmatively assists, or helps conceal, or fails to act when required to do so, thereby enabling the fraud ... to occur." *Fraternity Fund Ltd.,* 479 F.Supp.2d at 370 (citation omitted). The aider/abettor's actions must also "proximately cause[ ] the harm on which the primary liability is predicated." *Rosner v. Bank of China,* 528 F.Supp.2d 419, 426 (S.D.N.Y.2007). Where the primary fraud claim is predicated on misrepresentations in documents, substantial assistance usually involves assistance in the preparation or dissemination of the documents. *ABF Capital Mgmt. v. Askin Capital Mgmt.,* 957 F.Supp. 1308, 1328 (S.D.N.Y.1997). Where the fraud alleged involves a "highly interdependent scheme in which both parties benefited ... allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient." *Id.*

In *JP Morgan,* the court noted that a defendant's "mere presence, and passive receipt of email" cannot constitute affirmative assistance. 406 F.Supp.2d at 258 (finding that additional allegations that defendant was actively involved in the negotiation and approval of the improper swaps meets the pleading standard). However, the SAC alleges more than presence or passive awareness. According to the SAC, Coleman and Trevisani signed Partnership Agreements that misrepresented their expertise and permitted Siegal to represent them as experts in the oil and gas field in order to make the partnerships appear legitimate. (SAC ¶¶ 4, 46, 53, 124, 126.) As discussed above, these documents suggested that Defendants would carefully select the drilling sites and otherwise manage the strategic decisions such as land use or sale, equipment purchase, and other aspects of the supposed oil and gas investments. Although the SAC does not allege any direct dealings between Coleman, Trevisani, and Plaintiffs, this is not an element of the claim. As discussed above, the SAC alleges that Coleman and Trevisani "provided substantial assistance to advance the fraud" by permitting themselves to be named as managing partners which "deceived [Plaintiffs'] into believing that the Partnerships would be properly managed, with proper oversight." (SAC ¶¶ 124–126.)

These actions proximately caused Plaintiffs' harm, as it is reasonably foreseeable that Coleman and Trevisani's assistance (signing the partnership agreements as managing partners) and their concealment (not disclosing that they were in fact a children's camp CEO and an attorney, and thus lacking oil industry expertise) would cause Plaintiffs to invest in the partnerships and to suffer the loss of virtually all their investment. The aiding and abetting common law claim survives the motion to dismiss.

### D. Breach of Contract

The SAC contains breach of contract claims against Coleman and Trevisani for failing to distribute partnership income to Plaintiffs and diverting those funds to unknown purposes, and for failing to maintain adequate books and records reflecting the partnerships' transactions with respect to the withheld distributions. (SAC ¶¶ 138, 150.) Under New York law, to establish a breach of contract, a plaintiff must show the existence of a contract,

performance by one party, breach by the other party, and damages. *Rosenblatt v. Christie, Manson & Woods Ltd.,* 195 Fed. Appx. 11, 12 (2d Cir.2006). Coleman and Trevisani argue, in essence, that the first element is not satisfied because the payment of distributions is a partnership obligation and not a managing partner's personal obligation in contract. (Coleman Mem. Opp'n SAC 11–12.)

The Investment Proposals state that instead of receiving distributions in full from the partnership's income, a partner can assign a specified percentage of future distributions back to the partnership, which the partnership would use to purchase marketable securities. These securities would be used to pay off partnership debt. (SAC ¶¶ 48, 66, 77, 83.) Plaintiffs argue that Coleman and Trevisani breached the agreement by withholding distributions under the guise of purchasing securities, while no securities were ever purchased. (SAC ¶¶ 5, 128–152.)

Defendants argue that the Partnership Agreements do not contain provisions requiring the Managing Partner to make distributions, and that authorization to make distributions does not make the Managing Partner contractually liable. The *International Equity* case cited by Defendants, while not dispositive, suggests that partners may be liable for breach of fiduciary duty without being liable for breach of contract. *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.,* 475 F.Supp.2d 456, 461–62 (S.D.N.Y.2007) (finding that although the defendant may have breached his fiduciary duty by engaging in self-dealing in managing the investments, he "did not assume such a duty as a contractual obligation" in his capacity as the "Principal" partner).

Section 5 of the Partnership Agreements on the allocation of distributions reads[5]: "All cash revenues remaining after payment of the obligations incurred for drilling, operation and development of the Partnership Property, administrative costs, capital expenditures and establishing whatever cash reserve considered suitable by the Managing Partners shall be distributed 99% to the Partners and 1% to the Managing Partner." (Indian Village Drilling Co. Partnership Agreement § 5.03.) Section 6 of the Partnership Agreement states that the Managing Partner has the power and authority to "establish from income derived from the Partnership's operations such reserves as the Managing Partner shall deem reasonable ... [and] to distribute Partnership income at such times as, and to the extent that the Managing Partner determines there is sufficient cash on hand for Partnership requirements." (Indian Village Drilling Co. Partnership Agreement § 6.01(m).)

While the Partnership Agreements give Managing Partners the authority to make distributions, the language indicates that the timing and amount of distributions is within the Managing Partner's discretion. The agreement language does not require Managing Partners to make distributions or hold them contractually liable for the distributions. The failure to make such distributions, or to account for distributions allegedly withheld to purchase securities, may support other causes of action, but Plaintiffs do not point to specific language in the Agreements suggesting that the obligation is that of the Managing Partners individually, as opposed to a general partnership obligation.[6] As such, the

---

5. Because the language of the Indian Village, Condor, and Hurricane partnership agreements is substantially the same, all references are made to the Indian Village agreement.

6. The Court also notes, in support of Defendants' arguments on this point, that the SAC alleges "related agreements" in which "Plaintiffs agreed with the Partnerships" (not with the

Court grants Coleman and Trevisani's motion to dismiss on the breach of contract claims.

### E. Breach of Fiduciary Duty

 The SAC alleges breach of fiduciary duty against Coleman and Trevisani based on their "position[s] of trust" as Managing Partners with plenary powers to manage the Partnerships, and their withholding of distributions from Plaintiffs for purposes other than to purchase securities. (SAC ¶¶ 158–167.) As Defendants correctly argue, New York's blue sky law, the Martin Act, preempts a breach of fiduciary duty claim based on a securities transaction because the Act vests the State Attorney General with exclusive enforcement authority over securities fraud. *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02 Civ. 0767, 2003 WL 22052894, *2–*3, 2003 U.S. Dist. LEXIS 15206, at *6–*9 (S.D.N.Y. Sept. 2, 2003); *accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 190–91 (2d Cir.2001) ("[S]ustaining a cause of action for breach of fiduciary duty in the context of securities fraud would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney–General's exclusive enforcement powers thereunder.")

In response, Plaintiffs contend that this is not a breach of duty in the purchase and sale of securities, but rather a "breach of trust for failing to make distributions and diverting those funds purportedly earmarked to purchase marketable securities." (Pls.' Mem. Supp. SAC 26.) This distinction is unpersuasive. Elsewhere in the complaint, Plaintiffs allege that the financing arrangement of withholding distributions for the purchase of securities is a significant component of the fraud that induced Plaintiffs to invest. Coleman and

Coleman or Trevisani) that distributions

Trevisani's breach of fiduciary duty arises from the alleged securities fraud—the Partnership Agreement that Coleman and Trevisani signed and the oral representations of co-defendants all indicated that securities would be purchased from withheld distributions. The breach of fiduciary duty claims against Coleman and Trevisani are dismissed.

### F. Tortious Interference with Contractual Relations and Aiding and Abetting Breach of Fiduciary Duty

Plaintiffs allege that Defendant Siegal is liable for intentional tortuous interference with Plaintiffs' contractual relationships with Coleman, Trevisani, and the Partnerships by "insinuat[ing] himself into the day to day management of the Partnerships" and "caus[ing] [Coleman and Trevisani] to withhold the distributions which Plaintiffs had agreed would be applied to the purchase of securities." (SAC ¶ 156.) Plaintiffs further allege that Siegal aided and abetted Coleman and Trevisani's breach of fiduciary duty. (SAC ¶¶ 168–171.) Because this Court dismisses the underlying contract and fiduciary duty claims against Coleman and Trevisani, these claims against Siegal are also dismissed.

### G. Declaratory Judgment Pursuant to 28 U.S.C. § 2201

In their final two claims, Plaintiffs ask the Court for a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Palace Defendants and the Guralnick Defendants are liable for the tax penalties that Plaintiffs may be assessed and for the cost of defending the tax audits. Because of the Guralnick Defendants' alleged professional malpractice in the preparation of tax returns for the Hurricane Partnership, and

would be withheld. (SAC ¶¶ 132, 145.)

the Palace Defendants' alleged wrongdoing discussed above, Plaintiffs argue that the IRS is likely to disallow the IDC tax deductions and assess penalties based on, among other things, the drilling and abandonment of oil and gas sites prior to the partnerships being constituted. (SAC ¶ 174, 177–186.)

### 1. Palace Defendants

As a result of the wrongdoing of the Palace Defendants as set forth in the claims above, the SAC alleges that they are liable for the tax penalties and related costs that will be incurred by Plaintiffs.

Defendants' argument focuses on the hypothetical nature of the IRS action.[7] The hypothetical or uncertain nature of the IRS action is not fatal to Plaintiffs' claim. In *Seippel v. Jenkens*, the court held that because the plaintiff stated a "practical likelihood" that the IRS audit would result in penalties, the "contingent" nature of defendant's liability did not bar the plaintiff from maintaining a declaratory judgment for professional fees expended in connection with the audits. *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F.Supp.2d 363, 383 (S.D.N.Y.2004); *see also Associated Indemnity Corp. v. Fairchild Indus.*, 961 F.2d 32, 35 (2d Cir.1992) (holding, in declaratory judgment action against excess insurer where total damages were still unknown, "[t]hat the liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action").

Like the plaintiff in *Seippel*, Plaintiffs in this case are being audited by the IRS and the dispute has not been resolved. Although *Seippel* can be distinguished because the plaintiff there had already paid tax penalties and Plaintiffs here have not yet done so, the *Seippel* court also recognized that other damages existed in the form of expenses paid in the defense of the audits and losses incurred in the fraudulent transactions, and noted that contingent damages were a proper subject of a declaratory judgment action. 341 F.Supp.2d at 371. As the SAC alleges that some of the wells were drilled and abandoned prior to the Plaintiffs' investment, and that the partnerships do not own a working interest in the oil and gas sites, it is a "practical likelihood" that some of the deductions will be disallowed. Furthermore, since the submission of the SAC, Plaintiffs have informed the Court that the New York State Taxing Authorities have disallowed deductions taken by Plaintiffs for the partnerships and have imposed penalties in the amount of $79,294.00.[8] (Decl. of Ira Nathel, July 24, 2008.) In light of the facts pled in the SAC, the Court sees no advantage in waiting for the proverbial ax to fall with respect to the ultimate assessment of penalties.

Defendants rely on *Bernshteyn*, in which plaintiff sought a declaratory judgment that defendant, who managed payroll taxes for the corporation, was liable for federal and state taxes owed by the corporation (of which plaintiff was sole shareholder). *Bernshteyn v. Feldman*, No. 04 Civ. 1774, 2006 WL 2516514, at *1, *6–*7, 2006 US. Dist. LEXIS 62689, at *2, *22–*25 (S.D.N.Y. Aug. 29, 2006). The district court granted defendant's motion to dis-

---

**7.** On this issue, the Palace Defendants adopt the arguments laid out in the Guralnick Defendants' Memorandum in Opposition to Plaintiffs' Cross–Motion to Amend.

**8.** Defendants argue in their sur-reply that the Notice of Deficiency merely proposes adjustments that taxpayers have a right to contest. Whether or not this is true, the issuance of such a notice underscores the likelihood that deductions will be disallowed and penalties assessed.

miss because plaintiffs did not present a justiciable controversy with the defendant. Plaintiffs in *Bernshteyn* asked the court to adjudicate the tax liability as between the defendant and the federal government, and did not seek a declaratory judgment regarding the defendant's liability to them. The *Bernshteyn* decision is easily distinguished from the instant case because it "express[ed] no opinion regarding its jurisdiction to adjudicate an action seeking a declaration of Feldman's ... liability to plaintiffs for plaintiffs' tax liability to the federal or state governments." *Id.* at *7 n. 8, 2006 US. Dist. LEXIS 62689, at *26 n. 8. Here, Plaintiffs are seeking a judgment that Defendants are liable to them for their tax penalties. Thus, the Palace Defendants' motion to dismiss the declaratory judgment claim is denied.

## 2. Guralnick Defendants

 The declaratory judgment claim against the Guralnick Defendants is based on the K–1 forms prepared by the Guralnick Defendants for the Hurricane Partnership for the 2004 tax year. The SAC alleges that the Defendants "improperly prepared" both the partnership tax returns and the K–1s "by allocating a much larger portion of Hurricane's IDC for 2004" than they were entitled to deduct, since Plaintiffs could only deduct the portion of any IDC incurred after the date they joined the partnership. (SAC ¶¶ 183, 184.) As such Plaintiffs "will likely be damaged" for the penalties the IRS "has indicated will be assessed" and that underpayment is greater because of the alleged malpractice. (SAC ¶ 185.)

 The Court finds that it does not have jurisdiction over the claim against the Guralnick Defendants. The Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts; rather, "there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment." *Correspondent Servs. Corp. v. First Equities Corp.*, 442 F.3d 767, 769 (2d Cir.2006). Plaintiffs argue that the federal securities law claims provide federal question jurisdiction and that the Court has supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367. The SAC does not allege that the Guralnick Defendants were a part of the securities fraud or were involved in Plaintiffs' initial investment in the partnerships. The twelfth claim for relief against the Guralnick Defendants is based on their breach of professional duty of care in their accounting practice, and does not allege their involvement in the omissions and misrepresentations in the investments, which is the basis of the federal question jurisdiction. (SAC ¶¶ 177–186.) The claim is based solely on the preparation of a tax return for one partnership in one tax year, after the Plaintiffs had already invested. As such, it is not part of the same case or controversy, and it would not serve the ends of judicial efficiency for the Guralnick Defendants to continue as co-defendants in the securities fraud that forms the core of Plaintiffs' grievances. The declaratory judgment claim against the Guralnick Defendants is hereby dismissed without prejudice.

## III. Conclusion

For the reasons stated herein, the motions to dismiss the section 10(b) securities fraud and common law fraud claims are denied. The motion to dismiss the aiding and abetting claim against Coleman and Trevisani is denied. The breach of contract and breach of fiduciary claims against Coleman and Trevisani are dismissed, as are the related claims against Siegal for tortious interference with contractual relations and aiding and abetting Coleman and Trevisani's breach of fiduciary duty. The motion to dismiss the declar-

atory judgment claim against the Palace Defendants is denied, and the declaratory judgment claim against the Guralnick Defendants is dismissed without prejudice.

The parties are to submit a joint schedule to the Court on or before November 17, 2008, setting forth the dates for further proceedings in this case.

**SO ORDERED.**