**Eduardo Mazzaro DE ABREU, et al., Plaintiffs,**

v.

**BANK OF AMERICA CORPORATION, Bank of America, N.A. and Standard Chartered Bank, Defendants.**

No. 06 Civ. 673(LMM).

United States District Court, S.D. New York.

June 29, 2011.

Alexander L. Kaplan, Geoffrey Lloyd Harrison, Susman Godfrey L.L.P., Houston, TX, Daniel Edward Seltz, David S. Stellings, Lieff Cabraser Heimann & Bernstein LLP, New York, NY, for Plaintiffs.

Hayward Homes Smith, Robert Frank Wise, Jr., Shannon Kia Manigault, Davis Polk & Wardwell L.L.P., Anthony Ignatius Giacobbe, Jr., David Barry Chenkin, Zeichner Ellman & Krause LLP, Bradley Paul Smith, Julia Marie Guaragna, Sharon L. Nelles, Sullivan and Cromwell, LLP, New York, NY, for Defendants.

*CORRECTED MEMORANDUM AND ORDER*

McKENNA, District Judge.

Defendants Standard Chartered Bank ("Standard Chartered") and Bank of America Corporation and Bank of America, N.A. (collectively "BOA") (all, collectively, "Defendants") move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on two claims: aiding and abetting fraud and commercial bad faith. These claims were brought by individual plaintiffs ("Plaintiffs")[1] who were, allegedly, the victims of a Ponzi scheme perpetrated by the now-defunct offshore bank, Bank of Europe (and third parties connected with Bank of Europe), which used Standard Chartered and BOA as correspondent banks. For the reasons set forth below, Defendants' motions for summary judgment are GRANTED.

Defendants also move to exclude the testimony of Plaintiffs' witness Julie Schlossman on the ground that it was obtained by Plaintiffs' counsel in violation of Rule 3.4(b) of the New York Rules of Professional Conduct, the ethical rule against payments to a fact witness. (Mem. of Law in Supp. of Joint Mot. to Exclude the Test. of Julie Schlossman at 1.) Given that this Court is granting summary judgment in Defendants' favor despite having considered and credited Schlossman's testimony, Defendants' motion to exclude it is denied as moot.

Plaintiffs have moved to strike from the summary judgment record certain statements made in Defendants' Rule 56.1 Statements. (Pls.' Mot. to Strike Defs.' Summ. J. Evidence at 1.) This Court's granting of summary judgment, however, is not based on the evidence Plaintiffs seek to have struck. (*See id.* at 1–2.) Moreover, motions to strike are not required by Federal Rule of Civil Procedure 56, nor by this Court's Local Civil Rule 56.1, and are superfluous in summary judgment practice. Plaintiffs' motion to strike is therefore denied as moot.

## I. BACKGROUND

### A. Procedural History

Plaintiffs filed their initial complaint on January 27, 2006, and filed an amended complaint on April 24, 2006. The first amended complaint brought four claims against Standard Chartered and BOA: 1) aiding and abetting fraud; 2) aiding and abetting breach of fiduciary duty; 3) commercial bad faith; and 4) unjust enrichment. (First Am. Compl. ¶ 39.)

Standard Chartered and BOA moved to dismiss the first amended complaint, and in *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F.Supp.2d 381 (S.D.N.Y.2007) ("*Abreu I*"), this Court denied Defendants' motions with respect to Plaintiffs' commercial bad faith claim; dismissed with prejudice Plaintiffs' aiding and abetting breach of fiduciary duty and unjust enrichment claims; and dismissed Plaintiffs' aiding and abetting fraud claim with leave to replead with regard to the substantial assistance element. *Abreu I*, 525 F.Supp.2d at 398.

---

1. Ninety-four plaintiffs filed the initial complaint on January 27, 2006. *See Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F.Supp.2d 381, 383 n. 2 (S.D.N.Y.2007) ("*Abreu I*") (listing these plaintiffs). Twenty-six of the original plaintiffs had their claims dismissed with prejudice after refusing to participate in discovery. (Stipulation of Dismissals with Prejudice of Actions Brought by Certain Pls., So Ordered by the Ct. on Jan. 29, 2009; Mot. to Dismiss the Claims of Pl.-Countercl. Def. Edilson Ferreira da Silva, So Ordered by the Ct. on Dec. 14, 2009.)

In response to *Abreu I*, Plaintiffs filed a second amended complaint on November 16, 2007, reasserting their claims for aiding and abetting fraud and commercial bad faith. (Second Am. Compl. ¶¶ 252–59, 267–69.) Defendants moved to dismiss the second amended complaint, and in *Mazzaro de Abreu v. Bank of Am. Corp.*, 2008 WL 3171560 (S.D.N.Y. Aug. 6, 2008) ("*Abreu II*"), this Court denied these motions. *Abreu II*, 2008 WL 3171560, at *6.

## B. Facts

### 1. Plaintiffs Relationship with Bank of Europe

Nearly all of the Plaintiffs are Brazilians, or business entities owned by them, that invested money with Bank of Europe. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 72; *see also* Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 34 (stating that Standard Chartered understood that Bank of Europe's principal clients were corporate customers and high net worth individuals).) [2]

Bank of Europe was a private bank organized under the laws of Antigua and Barbuda and authorized to conduct offshore banking operations. (*Id.* ¶ 1.) Bank of Europe was affiliated with an established and well-known Brazilian bank, Banco Santos, which was owned by Edemar Cid Ferreira ("Ferreira"), a high-profile figure in the Brazilian banking world. (*Id.* ¶¶ 3–4.) Ferreira's wife was the owner of Bank of Europe. (*Id.* ¶ 5.) Ferreira himself controlled an entity called Alsace Lorraine Investment Services ("Alsace Lorraine"), which had an account at Bank of Europe. (*Id.* ¶ 6.)

Plaintiffs allege that Bank of Europe perpetrated a fraudulent Ponzi scheme and laundered money while using Defendants as correspondent banks. According to Julie Schlossman, a former Bank of Europe employee now serving as a witness for Plaintiffs, the Ponzi scheme operated as follows: Plaintiffs would transfer money into their individual Bank of Europe accounts at Standard Chartered or BOA, and if Plaintiffs indicated that they wanted to invest their money in Bank of Europe's "Loan Participation Program," [3] Bank of Europe would record a transfer of the money to Alsace Lorraine's Bank of Europe account on Bank of Europe's books, which were internal and not visible to the Defendants, and Alsace Lorraine would then issue a promissory note to Bank of Europe in the amount of the investment. (Wise Decl. in Supp. of BOA's Mot. for Summ. J., Ex. D, Schlossman Dep. ("Schlossman Dep.") at 273–74, 348, 482–85; *see also* Pls.' Counterstatement to

---

**2.** Citation to Plaintiffs' Counterstatement to Standard Chartered's or BOA's Rule 56.1 Statement indicates reference to the content of the Defendant's Rule 56.1 Statement itself, in addition to Plaintiffs' response to it. Such citation indicates that Plaintiffs did not dispute the part of statement cited or that this Court reviewed the record and found the part of the statement cited not to be in genuine dispute.

**3.** BOA disputes that the investment opportunity that Bank of Europe offered Plaintiffs was consistently referred to as the "Loan Participation Program." A number of Plaintiffs testified that Bank of Europe representatives induced them to open accounts at Bank of Europe and invest in fixed-interest investment products offered by Bank of Europe, variously described by Plaintiffs a s "participations," "time deposits," and "CDBs." (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶ 37.) Many Plaintiffs' testimony revealed that they did not have a clear understanding of what Bank of Europe was going to do with their investment money in order to earn the interest that Bank of Europe promised them; it was not made clear to them whether the money would be loaned to Banco Santos or invested elsewhere. (*Id.* ¶ 39.)

Standard Chartered's Rule 56.1 Statement ¶¶ 25–26 (explaining that Bank of Europe maintained a single account at Standard Chartered through which all customer transactions flowed, but Bank of Europe kept its own internal record of its customers' deposits and withdrawals).) Schlossman testified that this money was not invested to earn interest for Plaintiffs as promised but instead was transferred out of the Alsace Lorraine account to pay Ferreira's personal bills. (Schlossman Dep. at 273–75.)

On approximately November 11, 2004, the Brazilian Central Bank seized Banco Santos, citing allegations of fraud and illegal lending practices. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 15.) By November 26, 2004, it had been determined that Bank of Europe would be shut down. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶ 58.) Bank of Europe was placed into receivership in December 2004 and subsequently placed into liquidation in February 2005. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 16.) In 2006, Ferreira was convicted of crimes in connection with the fraud at Banco Santos. (*Id.* ¶ 17.)

Immediately after the press reported that the Brazilian Central Bank had intervened in the operations of Banco Santos, some Bank of Europe customers contacted Bank of Europe to withdraw their funds, but these efforts were unsuccessful. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶¶ 54–55, 57.)

**2. Bank of Europe's Correspondent Banking Relationships with Standard Chartered and BOA**

A correspondent bank is essentially a bank for other banks. (Standard Chartered's Rule 56.1 Statement ¶ 20.) A "respondent bank" establishes a deposit account with a correspondent bank for the purpose of receiving deposits and transferring funds. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 21.) Correspondent banking enables banks, no matter their location, to make payments and settle transactions quickly and reliably, and to move funds to pay for goods and services, often across borders. (*Id.* ¶ 22.)

Standard Chartered served as the correspondent bank for Bank of Europe from 1999 through December 2003. (*Id.* ¶¶ 24, 66.) Bank of Europe opened a correspondent bank account with BOA in September 2002, but did not begin to transfer money into or out of the account (except for approximately $9,500 in account maintenance fees) until approximately October 2003. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶¶ 1–2.)

## II. DISCUSSION

### A. Standard of Review

This Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

" 'An issue of fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving par-

ty' ''; '' '[a] fact is *material* if it might affect the outcome of the suit under the governing law.' '' *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 720 (2d Cir.2010) (emphasis added) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir.2008)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." *Davis v. State of New York*, 316 F.3d 93, 100 (2d Cir.2002) (citations omitted).

"The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.' " *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009) (quoting *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir.2004)). "However, the 'mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient' to withstand a motion for summary judgment." *Id.* (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

■ "A claim for aiding and abetting fraud must be proven by clear and convincing evidence." *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 488 (S.D.N.Y.2001) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997)), *reconsideration granted in part on other grounds*, 137 F.Supp.2d 438 (S.D.N.Y.2001). Therefore, to survive summary judgment, Plaintiffs must have adduced sufficient evidence to meet this standard at trial. *See id.* (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Woo v. Times Enters., Inc.*, 2000 WL 297114 (S.D.N.Y. Mar. 22, 2000)); *see also Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 558 (S.D.N.Y.2009) (explaining that, in proving the elements of a fraud claim, "the proponent of the claim must put forth clear and convincing evidence, a standard which applies at the summary judgment stage as well as at trial") (internal citations omitted).

## B. Claims

### 1. Aiding and Abetting Fraud

■ The elements of aiding and abetting fraud under New York law are: "(1) the existence of an underlying fraud; (2) knowledge of the fraud by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the underlying fraud." *Abreu I*, 525 F.Supp.2d at 387 (citing *Oei v. Citibank, N.A.*, 957 F.Supp. 492, 520 (S.D.N.Y. 1997)).

■ A showing of *actual* knowledge of the alleged fraud is required to support a claim for aiding and abetting fraud; constructive knowledge—the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud—is insufficient. *Id.* at 387–88 (citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., L.L.C.*, 446 F.Supp.2d 163, 202 (S.D.N.Y.2006)); *Fil-*

*ler v. Hanvit Bank,* 339 F.Supp.2d 553, 557 (S.D.N.Y.2004) (defining constructive knowledge). "The overwhelming weight of authority holds that actual knowledge is required, rather than a lower standard such as recklessness or willful blindness." *Rosner v. Bank of China,* 2008 WL 5416380, at *7 (S.D.N.Y. Dec. 18, 2008) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 202 n. 279 (S.D.N.Y.2006)); *see also Glonti v. Stevenson,* 2009 WL 311293, at *8 (S.D.N.Y. 2009) ("Actual knowledge, not mere notice or unreasonable unawareness, is therefore essential [to support a claim for aiding and abetting fraud].").

■ "The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *Chemtex, LLC v. St. Anthony Enters., Inc.,* 490 F.Supp.2d 536, 546 (S.D.N.Y.2007) (quoting *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F.Supp.2d 349 (S.D.N.Y.2007)). In *Chemtex, LLC v. St. Anthony Enters., Inc.,* in granting summary judgment to the defendant, the court explained that "New York courts have routinely held that when a defendant is under no independent duty [to plaintiffs], even alleged ignorance of obvious warning signs of fraud will not suffice to adequately allege 'actual knowledge.'" *Chemtex,* 490 F.Supp.2d at 547; *see also Rosner,* 2008 WL 5416380, at *10 ("[A] bank's ignorance of 'red flags' or obvious warning signs of fraudulent activity cannot establish a bank's actual knowledge sufficient to support a claim of aiding and abetting fraud."); *Rosner,* 2008 WL 5416380, at *6 (citing *Ryan v. Hunton & Williams,* 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (holding that allegations of a bank's authorizations of transfers between ac-

counts, multiple wire transfers, a branch manager's suspicion that certain accounts may have been vehicles for fraudulent activity, and the branch manager's referral of those accounts to the in-house fraud investigation unit "do not raise an inference of actual knowledge"); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* 1999 WL 558141, at *7 (S.D.N.Y. July 30, 1999) (holding that allegations that a bank knowingly or recklessly disregarded several "badges of fraud" in accounts involving millions of dollars did not give "rise to an inference, let alone a 'strong inference,' that the bank actually knew of, and participated in" the fraud); *Nathel v. Siegal,* 592 F.Supp.2d 452, 469 (S.D.N.Y.2008) (explaining, in its discussion of *Ryan,* that "[e]ven where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity and referred the case to its internal fraud unit, the bank had only suspicions but not actual knowledge of fraud") (additional citations omitted)).

### a. Actual Knowledge Element of Plaintiffs' Aiding and Abetting Fraud Claim Against Standard Chartered

In *Abreu I,* this Court found the following allegations sufficient to support Plaintiffs' allegation that Standard Chartered had actual knowledge: (1) "Standard Chartered transferred Bank of Europe funds to entities it knew were 'black market currency traders'"; and (2) Standard Chartered representative Eduardo Viola communicated to a Bank of Europe representative that Standard Chartered was concerned about getting caught making fraudulent transfers from Bank of Europe's account to Ferreira and his offshore companies, and that Standard Chartered did not want to risk violating the Patriot Act by participating in money laundering.

*Abreu I*, 525 F.Supp.2d at 389.[4]

■ While discovery has confirmed that Standard Chartered did not prevent transfers from Bank of Europe's Standard Chartered account to companies that Plaintiffs refer to as "black market currency traders," Plaintiffs have not adduced sufficient evidence that these transfers are evidence of Standard Chartered's actual knowledge of the alleged Ponzi scheme.

The companies that Plaintiffs refer to as "black market currency traders" are money services businesses ("MSBs"), which are known in Brazil as "doleiros." (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 56.) Doleiros make up a "parallel market" for the movement of money into and out of Brazil. The use of doleiros in Brazil has been widespread for decades, due to Brazil's currency control laws. (*Id.*)[5] Plaintiffs themselves used do-

4. In *Abreu I,* this Court held that the following allegations were *not* sufficient to support Plaintiffs' allegation that Standard Chartered had actual knowledge of the alleged fraud: (1) "[T]he nature of transfers out of the Bank of Europe account and the general amount of funds within the account" indicate actual knowledge of the fraud; (2) "Standard Chartered had a motive in the 'substantial fees' generated in exercising their 'unusually large volume' of opportunities to facilitate fraudulent transfers at the behest of Bank of Europe"; and (3) "Standard Chartered had actual knowledge of the identities of the recipients of the funds." *Abreu I,* 525 F.Supp.2d at 388–89. Because this Court, at the motion-to-dismiss stage, already found these three allegations insufficient to support an allegation of actual knowledge, it follows that these allegations, even if sufficiently supported by the discovery materials, are insufficient to support Plaintiffs' allegation of actual knowledge at the summary-judgment stage.

With regard to these allegations, however, this Court notes that, while Standard Chartered may have known general information about the Loan Participation Program, Plaintiffs have not adduced sufficient evidence to support an allegation that Standard Chartered knew the particulars of Plaintiffs' investments in it. (*See* Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶¶ 38–39.) Moreover, Bank of Europe did not provide information to Standard Chartered suggesting that the Loan Participation Program was the *only* proper destination for outgoing funds from Bank of Europe's account; rather, Standard Chartered understood that Bank of Europe offered its customers a variety of products, services, and investment opportunities, including American Express credit cards. (*Id.* ¶¶ 34, 35, 98.) A number of Plaintiffs used their Bank of Europe accounts

to pay the balance on their American Express cards and to pay other bills they owed. (*Id.* ¶ 36.)

Furthermore, as a correspondent bank, Standard Chartered processed thousands of transactions valued at billions of dollars every day. (*Id.* ¶ 42.) Standard Chartered explains that, since most such transactions were bank-to-bank transactions, Standard Chartered handled the overwhelming majority with "straight through processing," meaning that the transactions were effectuated electronically, without involvement of bank personnel. (*Id.* ¶ 43.) Only the small number of transactions with improperly formatted or insufficient payments instructions would be directed to the repair queue for manual review by a Standard Chartered employee. (*Id.* ¶ 45.)

Discovery also revealed that only a small portion of Standard Chartered's total business was derived from providing correspondent banking services to Bank of Europe. Between 2000 and 2003, Standard Chartered received a total of $113,971.50 in fees from Bank of Europe, as compared to total net income from fees and commissions of approximately $4 billion. (*Id.* ¶ 29.)

5. As Plaintiffs' expert Keith Rosenn, a law professor who specializes in Brazilian law and culture, explains:

Brazilian currency is not a freely-convertible currency. Brazilian law prevents Brazilians from maintaining bank deposits in foreign currency in Brazil. Since the 1930s, Brazil has had a complex system of exchange controls that prevent Brazilians from freely transferring their funds abroad. These controls have given rise to a black market, usually called the parallel market in Brazil. Brazilians commonly resort to the

leiros to deposit money in their Bank of Europe accounts. (*Id.* ¶ 57 (citing testimony of numerous Plaintiffs explaining that they personally used doleiros, that using doleiros was commonplace, and/or that they did not believe that the activities of doleiros were illegal or improper).)

An expert retained by Plaintiffs testified that, while the Defendants should have been very diligent in monitoring transactions that involved doleiros, it was not necessarily improper for Defendants to be banking with doleiros. (*Id.* ¶ 58 (citing Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J. Ex. 102, Dep. of Robert Goecks ("Goecks Dep.") at 203).) Furthermore, a March 2005 statement by the Treasury Department's Financial Crimes Enforcement Network stated:

> The Financial Crimes Enforcement Network has long recognized that the money services business industry provides valuable financial services, especially to groups and individuals that may not have ready access to the formal banking sector. Moreover, we believe it is imperative that money services businesses remain within the formal financial sector, and not be driven underground. Accordingly, the Financial Crimes Enforcement Network is committed to ensuring their continued access to banking services....

(*Id.* ¶ 59 (citing Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J. Ex. 55, Statement from the Financial Crimes Enforcement Network, U.S. Dep't of the Treasury, Mar. 8, 2005, at 1).) According to Plaintiffs' expert, this statement

was "to try and correct what was being perceived at the time as an overreaction of the financial services industry by simply dropping MSBs as clients." (*Id.* (citing Goecks Dep. at 202–203).)

This Court, now having a better understanding of companies Plaintiffs term "black market currency traders," finds that Standard Chartered's practice of engaging in transactions with these companies was not per se improper, and is not evidence of actual knowledge of the alleged Ponzi scheme. Even if a fact finder were to conclude that knowledge of such transactions amounted to "notice of 'red flags' " that Bank of Europe was engaging in fraudulent activity, such notice would not be sufficient to support an allegation of actual knowledge. *See Nathel v. Siegal*, 592 F.Supp.2d at 469 ("Even where a bank was on notice of 'red flags' that indicated certain accounts may have been vehicles for fraudulent activity . . ., the bank had only suspicions but not actual knowledge of fraud."). Moreover, even if Standard Chartered believed that transacting with doleiros was per se unquestionably improper, or that transacting with doleiros was synonymous with facilitating money laundering, that still would not indicate that Standard Chartered had actual knowledge of the alleged Ponzi scheme; a distinction must be made between 1) the alleged Ponzi scheme and 2) any money laundering that Bank of Europe, Ferreira, and/or the doleiros with whom they transacted may have engaged in. *See Rosner v. Bank of China*, 349 Fed.Appx. 637, 639 (2d Cir.2009) ("Even if [defendant bank] had

parallel market rather than the banking system to remit funds abroad because the informal system is faster and less expensive. Informal remittances avoid the need to account to the government as to the source of funds, eliminates [*sic*] payment of bank fees, financial transaction taxes, and reporting and paying taxes to Brazil on the inter-

est earned on the foreign bank account. Although it is unlawful to have unreported foreign bank accounts, this law is commonly honored in the breach.
(Federal Rule 26(a) (2)(b) Report of Keith S. Rosenn, Aug. 28, 2009, Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J. Ex. 9, at 5–6.)

reason to suspect that [the fraudster] was laundering money, this does not mean that [defendant] had actual knowledge of the fraudulent scheme.").

Second, Plaintiffs have not adduced sufficient evidence to support the allegation that Standard Chartered representative Eduardo Viola told a Bank of Europe representative that a reason Standard Chartered was terminating its correspondent banking relationship with Bank of Europe was that Standard Chartered was concerned about getting caught making fraudulent transfers from Bank of Europe's account to Ferreira and his offshore companies, and that Standard Chartered did not want to risk violating the Patriot Act by participating in money laundering. Plaintiffs identified Julie Schlossman, a former Bank of Europe employee, as the source of this allegation. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶ 87.) [6] Schlossman, however, testified that Viola never expressed this specific concern. (Id. ¶ 90 (citing Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J., Ex. 5, Schlossman Dep. at 299–300).) Rather, according to Schlossman, Viola told her that Standard Chartered was concerned generally (i.e., with regard to all 60 small bank accounts that Standard Chartered was exiting at that time, including Bank of Europe) about engaging in transactions involving doleiros. (Id.; Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J., Ex. 5, Schlossman Dep. at 285 ("[Viola] said that the bank changed the directions and they didn't want to have offshore banks anymore. And the main reason of that is because all the offshore banks work with doleiros, and Standard Chartered doesn't want to have doleiros anymore working in—having transfers in and out in their account."))

Viola denies that he ever told Schlossman that Standard Chartered was closing its account with Bank of Europe because of concerns about doleiros or about violating the Patriot Act, testifying that he simply informed her that Standard Chartered had changed its focus and wished to cater solely to the larger Brazilian banks. (Id. ¶ 91 (citing Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J., Ex. 8, Viola Dep. at 165–166).) However, even if Viola did tell Schlossman that a reason Standard Chartered had chosen to terminate its relationship with Bank of Europe and the 59 other small banks was its concern, generally, about transacting with doleiros or about violating the Patriot Act by participating in money laundering, that still would not indicate that Viola or Standard Chartered knew Ferreira and Bank of Europe were perpetrating a Ponzi scheme.

Not only have Plaintiffs failed to provide evidence that Viola told Schlossman that Standard Chartered was concerned about getting caught making fraudulent transfers to Ferreira and his offshore companies, but, in addition, Standard Chartered's bank records indicate that Standard Chartered decided to terminate its correspondent banking relationship with Bank of Europe, and 59 other small offshore banks, as the result of a broad policy decision to refocus its resources on building a customer base of larger financial institutions and to concentrate on relationships domiciled in Brazil. (Id. ¶¶ 60, 63.)

---

6. Defendants note that Julie Schlossman knowingly facilitated the alleged Ponzi scheme and also has served as a paid "consultant" for Plaintiffs' counsel. (Pls.' Counterstatement to Standard Chartered's Rule 56.1 Statement ¶¶ 88–89; Nelles Decl. in Supp. of Standard Chartered's Mot. for Summ. J., Ex. 5, Schlossman Dep. at 7, 355–56, 358–59.)

### b. Actual Knowledge Element of Plaintiffs' Aiding and Abetting Fraud Claim Against BOA

With respect to BOA, this Court, in *Abreu I*, found that the following allegations against BOA were sufficient to support Plaintiffs' allegation that BOA had actual knowledge of the alleged fraud: (1) "BOA transferred Bank of Europe funds to entities it knew were 'black market currency traders'"; and (2) "Paulo Pereira of BOA suggested to Bank of Europe that it 'more effectively could conceal the fraud by opening a separate bank account.'" *Abreu I*, 525 F.Supp.2d at 390.[7]

Regarding the first allegation, according to BOA, it believed that the doleiros with whom it transacted on behalf of Bank of Europe—Lespan and Tansy—were legitimate and regulated MSBs, which, as is common in South American markets, offered wire and foreign exchange services. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶ 78.) As part of BOA's Know–Your–Customer due diligence, a BOA risk manager visited Lespan's "head" office in Uruguay, and met with its owners and compliance officers, who demonstrated the company's anti-money-laundering policies and systems and who left the BOA risk manager with the impression that Lespan was a substantial company that appeared to be well run. (*Id.* ¶ 79.) On the same trip to Uruguay, the BOA risk manager visited the Central Bank of Uruguay, and, according to him, when he

---

7. In *Abreu I*, this Court found that the following allegations were *not* sufficient to support Plaintiffs' allegation that BOA had actual knowledge of the alleged fraud: (1) "[T]he nature of transfers out of the Bank of Europe accounts and the general amount of funds within the accounts" indicate actual knowledge of the fraud; (2) "BOA, similar to Standard Chartered, had a motive in the 'substantial fees' generated in exercising their 'large volume' of opportunities to facilitate transfers that were part of a 'fraudulent scheme at the behest of Bank of Europe'"; (3) "[two] BOA employees assigned to the Bank of Europe account [] shared a joke with a representative of Bank of Europe pertaining to the financial advantages of being related to one of the Bank of Europe beneficiaries"; (4) "[BOA representatives] 'knew they were helping Ferreira steal Plaintiff's [*sic*] money'"; (5) "BOA, like Standard Chartered, had actual knowledge of the identities of the recipients [of the funds]." *Abreu I*, 525 F.Supp.2d at 389–90. Because this Court, at the motion-to-dismiss stage, already found these allegations insufficient to support an allegation of actual knowledge of the alleged fraud, it follows that these allegations, even if sufficiently supported by the discovery materials, are insufficient to support Plaintiffs' allegation of actual knowledge at the summary-judgment stage.

With regard to these allegations, however, this Court notes that Bank of Europe represented to BOA that its business was to provide "[f]inancial services and asset allocation and investment management for a select client group" and indicated that it provided American Express cards to its customers. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶¶ 67–68) (quoting Wise Decl. in Supp. of BOA's Mot. for Summ. J., Ex. B, Ex. 225, at BOA 001380.) Bank of Europe did not communicate to BOA that the only proper destination for Bank of Europe customer funds was the Loan Participation Program.

Furthermore, deposits and withdrawals by Bank of Europe clients into and out of their Bank of Europe accounts were transmitted electronically through BOA's electronic payment system without human intervention. This was the case so long as the electronic payment instructions were properly formatted by the party making the transfer on the client's behalf, which, in the case of a transfer in, would be the financial institution or doleiro the client chose to use, and, in the case of a transfer out, would be Bank of Europe. (*Id.* ¶¶ 5–8, 10–12.)

This Court also notes that, as compensation for serving as Bank of Europe's correspondent bank, BOA earned a total of $47,294 in revenue (not profit)—a sum, BOA argues, that would not be worth BOA risking its business reputation, civil liability, and substantial losses on its outstanding loans to Banco Santos. (Reply Mem. in Supp. of Mot. for Summ. J. by BOA at 3.)

asked the Uruguayan Central Bank about their markets, the Central Bank did not raise concerns about any entities and assured him that there were no issues. (*Id.* ¶ 80.)

Some Plaintiffs themselves used Lespan and Tansy in connection with their Bank of Europe accounts. (*Id.* ¶¶ 85–88.)

In 2004, the Manhattan District Attorney, in connection with an investigation captioned *Investigation Into International Money Laundering by John Doe,* served two subpoenas on BOA: a March 17, 2004 subpoena requesting records relating to Lespan's account, and a September 8, 2004 subpoena requesting records relating to Tansy's account and those of several other customers of BOA. (*Id.* ¶ 83.) These subpoenas—which concerned Lespan and Tansy generally, not in specific relation to Bank of Europe-could be considered "red flags" that these doleiros had been involved in money laundering; however, as explained above, notice of "red flags" does not indicate actual knowledge. *See Nathel,* 592 F.Supp.2d at 469–70. Moreover, learning that these doleiros engaged in money laundering would not indicate that Bank of Europe necessarily engaged in money laundering, nor—more to the point—that Bank of Europe was perpetrating a fraudulent Ponzi scheme.

■ Thus, the fact that BOA did not prevent the transfer of funds from Bank of Europe's account to doleiros, even after BOA received subpoenas requesting records relating to Lespan and Tansy, is not sufficient evidence to support the allegation that BOA had actual knowledge of the alleged Ponzi scheme.

Second, Plaintiffs have not adduced sufficient evidence to support the allegation that BOA representative Paulo Pereira suggested to Bank of Europe employee Julie Schlossman that Bank of Europe more effectively could conceal the fraud

by opening a separate bank account for Alsace Lorraine. According to Schlossman's testimony—Plaintiffs' sole evidence regarding this allegation—BOA's alleged request that Alsace Lorraine open an account at BOA followed, and was in reference to, a January 2004 inquiry concerning wire transfers into Bank of Europe's BOA account to Alsace Lorraine, the entity that was controlled by Ferreira and had an account with Bank of Europe.

The January 2004 inquiry, termed a Request for Information ("RFI"), was issued by BOA's Risk Monitoring, the unit that operated BOA's electronic transaction monitoring system. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶¶ 27, 90, 95.) The RFI explained that the wire activity was being reviewed because: 1) "Beneficiary is receiving a high volume and amount of wires that do not provide any reference or additional information to link each wire to a legitimate contract, goods, or service"; and 2) "Unable to verify the identity of the Beneficiary of the wires. Most of the wires are being originated by Money Service Businesses so true identity of the originators cannot be determined." (*Id.* ¶ 90; Wise Decl. in Supp. of BOA's Mot. for Summ. J., Ex. X, BOA Request for Information—Wire Transfer Activity, dated Jan. 7, 2004, Ex. 555, at BOA 000943.)

When BOA contacted Bank of Europe regarding Alsace Lorraine and the wire activity identified in the RFI, Bank of Europe confirmed that Alsace Lorraine was a customer of Bank of Europe, and that Bank of Europe had experienced a "good and stable relationship" with Alsace Lorraine since August 2001. (*Id.* ¶¶ 91, 93.) Bank of Europe further confirmed that the activity of Alsace Lorraine was "within the projected parameters" for Alsace Lorraine's account at Bank of Europe

and set forth the projected and actual incoming payment order parameters for that account. (*Id.* ¶ 94.) Lastly, Bank of Europe confirmed that the transactions involving Alsace Lorraine had been reviewed under Bank of Europe's internal anti-money-laundering program, and explained that "[a]ll customer transactions are subjected to a monitoring program through our own developed software system ..., through which we monitor each transaction activity of a customer." (*Id.* ¶ 95.)

Plaintiffs allege that following this inquiry, Pereira and, in a separate conversation, BOA representative Maria Ines Palazzi, suggested to Schlossman that Bank of Europe open a separate account for Alsace Lorraine at BOA to "avoid the kind of red flags that recently had been triggered within BOA" (i.e., to more effectively conceal the fraud). (Pls.' Mem. in Opp' n to Standard Chartered's and BOA's Mots. for Summ. J. at 25.)[8] The statements that these BOA representatives allegedly made to Schlossman regarding the opening of a separate Alsace Lorraine account, however, are not sufficient to support an allegation that either of the two BOA representatives had actual knowledge of the alleged Ponzi scheme as opposed to a desire to prevent the repeated triggering of RFIs like the January 2004 inquiry regarding Alsace Lorraine. (*See* Schlossman Dep. at 418–20, 423–24, 454–57, 526–27.)[9]

8. This allegation that Plaintiffs now make differs slightly from the allegation they made initially in paragraph 192 of their First Amended Complaint, where they alleged that Pereira suggested to Bank of Europe that it "more effectively could conceal the fraud by opening a separate bank account." (First Am. Compl. ¶ 192.) Schlossman testified that she was not the source of the allegation in the Second Amended Complaint corresponding to the allegation made in paragraph 192 of the First Amended Complaint, and that she never had a conversation with any BOA representative in which the BOA representative directly mentioned the alleged fraud or a Ponzi scheme. (Seltz Decl. in Supp. of Opp'n to Defs.' Mots. for Summ. J., Ex. 26, Schlossman Dep. at 443–44, 454–57.)

9. Schlossman testified that the BOA representatives said the following:

[T]hey ask us to open a new account, a separate account, Alsace–Lorraine, because we are doing a lot of payments in Bank of Europe with this account number. And they want us to open this separate account, to take out the light from Bank of Europe. You know, as we are doing all the payments from Edemar from—with this particular account, they ask us to open a separate account and to take out, you know, the focus from the Bank of Europe in those payments. (Schlossman Dep. at 418.)
. . .
[Palazzi explained it would be better] [b]ecause it was very complicated under all of the laws and everything, have so many transfers done from our bank through this account paying Edemar's bills.
. . .
[No, she did not speak about Edemar's bills] directly, but we are paying lots of things. (*Id.* at 419–20.)
. . .
[Pereira] asked us to open a separate account as well.
. . .
[He said,] "That will be better because we can—we will have problems as we had before if we're still working with this account" [and] "It will be very difficult to still withdrawing money from this particular account." (*Id.* at 423.)
. . .
No [, I didn't have any discussion with him about a fraud going on.] But as I told you, we never said the word "fraud." It was subliminal. (*Id.* at 424.)
. . .
[H]e said that it is going to be better for us to [open a separate account]. It will be safer. It will be nicer if we did this. Otherwise we will have—still have problems. They will still putting red flags questioning some transfers. It was more like this, the conversation. (*Id.* at 454.)
. . .
Of course [neither I nor Pereira ever used the words "conceal the fraud"]. (*Id.* at 455.)
. . .

Plaintiffs have not shown why BOA's alleged request that Alsace Lorraine open its own BOA account would, in itself, raise an inference of actual knowledge of the alleged Ponzi scheme. First, Plaintiffs do not provide sufficient evidence to support an allegation that anyone at BOA actually knew that Alsace Lorraine was connected to the Loan Participation Program. Schlossman specifically denied telling anyone at BOA that the Loan Participation Program funds were funneled through Alsace Lorraine. (*Id.* at 432.) Schlossman also testified that she was not in a position to know whether BOA had knowledge of any connection between the Loan Participation Program and Alsace Lorraine. (*Id.* at 442.) In addition, the documents that BOA received from Bank of Europe that mentioned "participation agreements" did not mention Alsace Lorraine, and transfers from Bank of Europe's customers' accounts at Bank of Europe to Alsace Lorraine's account at Bank of Europe were book (not actual) transfers that occurred only on Bank of Europe's internal books, which BOA did not have access to. (Pls.' Counterstatement to BOA's Rule 56.1 Statement ¶¶ 13–14, 100–01.)

Furthermore, even if Schlossman's testimony speculating that Palazzi knew Ferreira was the owner of Alsace Lorraine (Schlossman Dep. at 421) was proven true, and it was further proven that BOA knew

Ferreira was paying his personal bills out of the Alsace Lorraine account, that still would not indicate that BOA knew Ferreira was using misappropriated money to pay those bills, because Plaintiffs have not put forth sufficient evidence showing that BOA knew that the money in Alsace Lorraine's account belonged to Loan Participation Program investors or that Ferreira did not have his own money in that account.

Lastly, Plaintiffs fail to explain how having Alsace Lorraine open its own account at BOA would have helped conceal Alsace Lorraine's activity. As BOA explains, in response to BOA's January 2004 inquiry to Bank of Europe regarding Alsace Lorraine's activity, Bank of Europe had vouched for Alsace Lorraine and said its level of activity was consistent with expectations, but did not state who owned Alsace Lorraine or the nature of its activity. (Rep. Mem. in Supp. of Mot. for Summ. J. by BOA at 7.) If Alsace Lorraine opened an account at BOA, Alsace Lorraine would be subject to BOA's own due diligence, and BOA would be able to go directly to Alsace Lorraine, as opposed to through Bank of Europe, with any questions it had. (*Id.* at 7–8.)

Thus, the allegation that BOA representatives suggested that Alsace Lorraine open a separate account is not sufficient to

No[, I do not recall any conversation at any time that I had with Pereira, or any other Bank of America representative, in which I said there was a fraud going on at Bank of Europe.]
. . .
No, I never used those words. (*Id.* at 456–57.)
. . .
[Pereira] said it will be good for us to open a separate account since we are doing a lot of payments through Alsace–Lorraine account with Bank of Europe and Bank of America.

And it was very complicated. They will probably be caught about this. We will be caught about this. He questioned already some transfers done through Alsace–Lorraine.
And he thought that it will be a good idea to separate this—this account from the Bank of Europe account, not to be, you know, showing all of the payments that we were doing—doing under Edemar's name, you know. (*Id.* at 526–27.)

support the allegation that BOA had knowledge of the alleged Ponzi scheme.

In sum, Plaintiffs have not provided sufficient evidence to support their allegations that Defendants had actual knowledge of the alleged Ponzi scheme, and therefore, there is not clear and convincing evidence upon which a jury could find that either Defendant aided and abetted the alleged fraud.

This Court need not discuss the remaining two elements of the aiding and abetting fraud claim.

## 2. Commercial Bad Faith

 As this Court explained in *Abreu I,* the elements of commercial bad faith against a bank are: "(1) a scheme or acts of wrongdoing; together with either: (2) allegations of the bank's actual knowledge of the scheme or wrongdoing that amounts to bad faith; or (3) allegations of complicity by bank principals in alleged confederation with the wrongdoers." *Abreu I,* 525 F.Supp.2d at 394–95 (citing *Peck v. Chase Manhattan Bank, N.A.,* 190 A.D.2d 547, 548–49, 593 N.Y.S.2d 509 (1st Dep't 1993)). As this Court further explained:

> Complicity is engaging in wrongdoing in confederation with others. "Bank principals" include "account officers responsible for" the pertinent account. A correspondent bank becomes a participant to a fraudulent scheme when it "acts dishonestly[when] it has actual knowledge of facts and circumstances that amount to bad faith."

*Id.* at 395. "[A]llegations that a bank 'disregard[ed] ... suspicious circumstances which might have well induced a prudent banker to investigate' do not suffice to state a claim for commercial bad faith." *Nigerian Nat'l Petroleum Corp.,* 1999 WL 558141, at *8.

### a. Actual Knowledge Element of Plaintiffs' Commercial Bad Faith Claim Against Standard Chartered

 As explained, "[i]n a commercial bad faith claim, fulfillment of either the second or the third element is required." *Abreu I,* 525 F.Supp.2d at 395. Regarding the second element—actual knowledge— Plaintiffs again allege that, in communications with Bank of Europe, Standard Chartered representative Eduardo Viola communicated to Schlossman that Standard Chartered was concerned about getting caught making fraudulent transfers to Ferreira and his offshore companies, and that Standard Chartered did not want to risk violating the Patriot Act by participating in money laundering. *Id.* As explained above, however, Plaintiffs have not provided sufficient evidence to support the allegation that Viola expressed concern about getting caught making fraudulent transfers to Ferreira and his offshore companies. With regard to the second half of the allegation, as also explained above, even if Viola expressed Standard Chartered's general concern (i.e., with regard to all 60 small banks with whom it had chosen to terminate its relationship) about transacting with doleiros or violating the Patriot Act by participating in money laundering, this would not indicate that Viola or Standard Chartered had knowledge of the alleged Ponzi scheme.

### b. Actual Knowledge Element of Plaintiffs' Commercial Bad Faith Claim Against BOA

 Similarly, as explained above, Plaintiffs have not adduced sufficient evidence to support the allegation that a BOA representative suggested to Schlossman that Bank of Europe open a separate bank account for Alsace Lorraine *for the purpose of more effectively concealing the alleged fraud.*

Thus, Plaintiffs have not put forth sufficient evidence to support the second element of their commercial bad faith claim, with respect to either Defendant.

### c. Complicity by Bank Principals Element of Plaintiffs' Commercial Bad Faith Claim Against Standard Chartered

■ Regarding the third element of commercial bad faith—complicity by bank principals—Plaintiffs again raise the allegation that Viola communicated to Schlossman that Standard Chartered was concerned about getting caught making fraudulent transfers to Ferreira and his offshore companies and that Standard Chartered did not want to risk violating the Patriot Act by participating in money laundering. For the reasons discussed above, however, Plaintiffs have not provided sufficient evidence to support the allegation that Viola expressed a concern in specific regard to Ferreira, and any general concern about doleiros or the Patriot Act that he may have expressed would not indicate that he or Standard Chartered had actual knowledge of the alleged Ponzi scheme.

### d. Complicity by Bank Principals Element of Plaintiffs' Commercial Bad Faith Claim Against BOA

In an attempt to show complicity by a BOA bank principal, Plaintiffs again raise the allegation that a BOA representative suggested to Schlossman that Bank of Europe more effectively could conceal the alleged fraud by opening a separate bank account for Alsace Lorraine. However, as explained above, Plaintiffs have not adduced sufficient evidence to support this allegation.

■ In sum, Plaintiffs have not provided evidence to support either the second or third element of their commercial bad faith claim, with respect to either Defendant. Therefore—since either the second or third element is required to make out the claim—there is not clear and convincing evidence upon which a jury could find either Defendant guilty of commercial bad faith.[10] This Court need not discuss the remaining element of the commercial bad faith claim.

### 3. Plaintiffs Have Failed to Support the Required Elements of Their Claims

Plaintiffs have not adduced evidence upon which a reasonable jury could find by clear and convincing evidence that Plaintiffs proved the required elements of their claim of aiding and abetting fraud or their claim of commercial bad faith, with respect to either Standard Chartered or BOA. In other words, Defendants have shown that the materials cited do not establish the presence of a genuine dispute as to any material fact, and Defendants are therefore entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a), 56(c)(1); *Primavera Familienstifung*, 130 F.Supp.2d at 488.

### III. CONCLUSION

For the foregoing reasons, Standard Chartered's and BOA's motions for summary judgment are GRANTED.[11]

SO ORDERED.

---

10. It is questionable whether a claim for commercial bad faith is even available to Plaintiffs, as the Second Circuit has expressed "considerable doubt whether the doctrine has any applicability to .. claims [that] do not allege fraud in the making and cashing of checks." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir.2006).

11. Defendants' motion to exclude the testimony of Julie Schlossman and Plaintiffs' motion

to strike certain statements are denied as moot.